[No. G041414. Fourth Dist., Div. Three. June 21, 2010.]

THRIFTY PAYLESS, INC., Plaintiff and Appellant, v.
MARINERS MILE GATEWAY, LLC, Defendant and Respondent.

COUNSEL

Lurie, Zepeda, Schmalz & Hogan, Wayne C. Arnold, Robert W. Denton, Troy L. Martin and Catherine M. McCleary for Plaintiff and Appellant.

Burkhalter Kessler Goodman & George, Daniel J. Kessler and Michael Oberbeck for Defendant and Respondent.

OPINION

**MOORE, J.**—This is a dispute about a lease for new commercial property between tenant and plaintiff Thrifty Payless, Inc., doing business as Rite Aid (Rite Aid), and landlord and defendant Mariners Mile Gateway, LLC (Mariners). The lease, negotiated in 2004 and 2005, required a heavy investment of time and money by Mariners to build a new, high-end shopping center, while Rite Aid had few obligations until the lease began. The parties agreed that unless the lease began by June 30, 2008, either party would have the right to terminate "for any reason." One of Mariners's many obligations was obtaining the necessary approvals for a traffic signal.

The years went by with various communications between the parties, including a request by Mariners to increase Rite Aid's rent and the prospect

of a substitute tenant. Eventually, relations deteriorated, leading to this lawsuit. Despite the problems and this litigation, there was clear evidence that Mariners continued to attempt to develop the property, including trying to obtain approvals for the traffic signal. Such approval, however, was never granted, and the center was never built. On July 1, 2008, Mariners exercised its right to terminate the lease "for any reason" by notifying Rite Aid.

During trial, which began a few months later, the court granted Mariners's motion for nonsuit. The court concluded that the lease gave Mariners the absolute right to terminate, and therefore, Rite Aid could not recover as a matter of law. The court later granted Mariners expert witness fees pursuant to a provision in the lease over Rite Aid's objection. Rite Aid argued that Mariners had failed to specially plead and prove its entitlement to and the amount of expert witness fees at trial. We reject Rite Aid's arguments and find that granting the nonsuit was proper as a matter of law, and we uphold the court's decision to permit Mariners to recover its expert witness fees. The judgment and postjudgment order are affirmed.

I

FACTS

In 2004, Mariners, the owner of a parcel of property at the corner of west Pacific Coast Highway (PCH) and Dover Drive in Newport Beach (the site or the property), contacted Rite Aid regarding a potential new drugstore at the site. David Goldman, one of Mariners's partners, presented the project as "upscale" and "the nicest thing that any of us had seen in Newport Beach." Mariners's development plan, as presented to the City of Newport Beach (the City), included a number of variances and exemptions. The plan also called for widening PCH and installing a traffic signal at the main entrance.

In February 2004, the parties signed a letter of intent to negotiate a lease, which included such basic terms as proposed rent and the term of the lease. Tracy Verastegui, a real estate manager who signed on Rite Aid's behalf, noted in the letter that the agreement was conditional upon Mariners obtaining a traffic signal.

While such discussions were beginning with Rite Aid, Mariners also began the process of reviewing the proposed development with the City. Notes from a March 2004 meeting of the City's design review committee noted a number of potential issues, and specifically suggested moving forward with

an environmental impact report (EIR).[1] Mariners submitted its application for entitlements to the City on July 1, 2004. Some of the required technical studies were incomplete, although this was not unusual, because some of the work had to be commissioned by the City, not Mariners.[2]

Rite Aid and Mariners continued negotiations and went through several drafts before signing a lease on August 4, 2005. The basic provisions included a term of 20 years with several options to extend, and annual rent of $690,000 for the first 10 years and $759,000 for the second half of the lease. The building Mariners agreed to construct for the Rite Aid store was approximately 13,000 square feet.

The lease also included a number of termination provisions of import to this case. Article 53 of the lease gave Mariners an early termination right. "This Lease is expressly contingent upon Landlord satisfying or waiving the following contingencies within the time period set forth below. If Landlord, exercising commercially reasonable efforts and due diligence, is unable to satisfy such contingencies to Landlord's satisfaction, as determined in Landlord's sole discretion by June 1, 2006, then Landlord shall have the right to terminate this Lease upon written notice to Tenant." The contingencies listed were obtaining financing and "all necessary entitlements, permits, approvals and licenses from applicable governmental authorities for the development of the Center and the performance of Landlord's Work."

Article 3 of the lease addressed the commencement of the lease's term, and stated that the lease would begin 90 days after the property was delivered by Mariners, or when Rite Aid opened for business, whichever came first. Article 3 also stated: "If, for any reason (other than delays caused by Tenant) the Lease Term has not commenced by June 30, 2008, Tenant and Landlord shall each have the right to terminate this Lease by giving written notice to the other; provided, however, that if Tenant gives such notice to Landlord and Landlord delivers the leased premises to Tenant and satisfies the conditions of the Lease Term commencement within ninety (90) days after the date of the Termination Notice, then such Termination Notice shall be conclusively deemed to be null and void and not of force and effect." This provision was different from the initial draft proposed by Rite Aid, which gave only Rite Aid the right to terminate in the event the lease could not begin by the designated date.

---

[1] Ultimately, the project proceeded with a mitigated negative declaration (MND), a less complex study.

[2] Perhaps unsurprisingly, Rite Aid and Mariners view Mariners's progress toward obtaining the necessary approvals during this period quite differently. Mariners points to its efforts at community outreach, attempts to coordinate with the Department of Transportation (Caltrans), and completion of a number of necessary studies. Rite Aid views Mariners's actions as delayed and insufficient.

Article 6(c) of the lease required Mariners to "diligently prosecute to completion the construction [of the center] so that the completion date will occur no later than June 30, 2008," and article 6(a) stated that all improvements would "comply with all laws (including environmental), ordinances, rules, regulations and orders of any duly constituted authority . . . ." Article 6(a) also included "the installation of the traffic signal" as part of the landlord's required work.

Article 6(b) stated: "Failure by Landlord to complete construction . . . by June 30, 2008, shall be a default by Landlord and in the event of such default, Tenant shall have, the right to terminate this Lease by giving Landlord at least thirty (30) days written notice of such termination during which time Landlord shall have the right to cure its default, and if Landlord does so during such time period, then notice of termination shall be deemed rescinded."

Several other provisions of the lease are also of import here. Article 22 limited Rite Aid's damages in the event of a breach by Mariners, stating that in the event of Mariners's "default on the performance of any covenant or agreement herein . . . Tenant shall be entitled to sue Landlord for damages (but not consequential or punitive damages or loss of profits) sustained by Tenant as a direct result of Landlord's breach." Article 33.1 of the lease states the prevailing party is entitled to "reasonable expenses," including attorney fees, "court costs, witness and expert fees."

After the lease was signed, in October 2005, Mariners's consultant released a draft of the MND. They also continued to take steps to work with Caltrans on traffic issues. In January 2006, the City's planning commission unanimously approved the project. Doug Beiswenger, a Mariners partner, informed Rite Aid of the approval shortly thereafter, with the caveat that Caltrans was the variable in the construction timeline.

The City issued a notice of final approval in early February. The approval included 93 conditions that had to be met before the City's final certification once construction was complete. Several of these reflected an expectation that Caltrans would approve the application for a traffic signal.

Around mid-2006, Mariners proposed what it refers to as a "lease amendment" and what Rite Aid refers to as a "campaign of deception and threats" to increase the rent. Goldman and Verastegui apparently had a number of conversations in which Goldman informed Verastegui that construction costs had increased. Goldman also referred to a "2-way termination right" if the lease did not begin by June 30, 2008. Rite Aid was neither interested in terminating the lease nor in paying more rent at that time. From Rite Aid's

perspective, Mariners misrepresented that it could not currently complete construction by June 30, 2008, including "alter[ing]" construction schedules.

On June 21, 2006, Goldman sent a letter to Rite Aid stating that construction had been delayed due to the Caltrans review. He proposed a lease amendment altering the final outside completion date from June 30, 2008, to December 31, 2008. This amendment was not executed. There was further correspondence in July, with Rite Aid representative Terry Halbur requesting a status update, and a reply from Beiswenger that the Caltrans approval was an outstanding issue. Halbur met with Beiswenger in August 2006 to discuss the matter further. Rite Aid, for its part, points out that during this period, and as late as February 2007, Mariners continued to represent to other potential tenants that the property would be open in the spring of 2008.

On October 27, 2006, Mariners's counsel sent a letter to Rite Aid stating: "Despite exercising commercially reasonable efforts and due diligence, Landlord has not been able to obtain all such necessary entitlements, permits, approvals and licenses for the development of the Center." The letter further stated that Mariners was considering its options, referencing the article 53 termination provision, and asking Rite Aid to contact Mariners to discuss further options.

On November 9, Rite Aid filed, but apparently did not serve, the instant action. The initial complaint alleged three separate claims for breach of contract, and causes of action for declaratory relief, specific performance, and injunctive relief.

On November 15, Goldman and Verastegui had another conversation regarding Mariners's construction costs. Verastegui stated that Rite Aid would not pay rent in excess of the amount stated in the original lease. Goldman informed her the alternative might be termination, and he asked Rite Aid to reconsider its position. As of December 2006, correspondence regarding construction continued to be exchanged between the parties.

Rite Aid filed a first amended complaint (the complaint) on December 1, and the complaint was, apparently, served on Mariners around that time. The complaint included two claims for breach of contract, and causes of action for declaratory relief, promissory estoppel, breach of the implied covenant of good faith and fair dealing, and fraud.[3]

Starting in early December 2006, Mariners began discussing leases with potential replacement tenants. In January 2007, Mariners signed a letter of

---

[3] The fraud claim was dismissed at trial.

intent with Walgreens indicating an annual fixed rent of $936,000 for the first 10 years, plus a percentage of sales. (This amount was $246,000 more than Rite Aid's rent under its lease, plus percentage sales.)

The draft lease between Mariners and Walgreens contemplated a substantial completion date of November 1, 2008, and an outside completion date of June 30, 2010. By contrast, in a February 13, 2007 e-mail to another potential tenant, Goldman continues to state June 30, 2008, as an expected turnover date. The draft lease also included, as an express condition, that a traffic signal be installed adjacent to the primary entrance. In the absence of the traffic signal, Walgreens would be entitled to cancel the lease without liability.

On March 16, 2007, Mariners filed a cross-complaint (later dismissed) and answer to Rite Aid's complaint.[4] On March 21, Mariners sent Rite Aid a letter purporting to terminate the lease under article 53. In response, Rite Aid filed a motion for preliminary injunction, seeking to enjoin Mariners from leasing the property to anyone else and from developing the property in any manner not consistent with the lease. On May 11, the court granted the injunction. Once Walgreens, who had already signed a lease, learned of the court's ruling, it notified Mariners that they no longer had any interest in the property and revoked its offer to lease.

Meanwhile, in November 2006 and March 2007, Mariners filed additional "submittals" with Caltrans regarding the street improvements. Caltrans responded in April, stating the application could not be approved as submitted. Additional information was requested about some matters, and with respect to the traffic light, Caltrans denied Mariners's request and suggested some

---

[4] The cross-complaint serves as a relevant point for us to raise the issue of the "wretched excess" that is the appellant's appendix in this case. (*Silvaco Data Systems v. Intel Corp.* (2010) 184 Cal.App.4th 210, 217, fn. 2 [109 Cal.Rptr.3d 27].) It runs 20 volumes and 5,229 pages, along with an 18-volume reporter's transcript of 3,323 pages. We remind all litigants of rule 8.124(b)(3)(A) of the California Rules of Court, which states that an appendix must not "[c]ontain documents or portions of documents filed in superior court that are unnecessary for proper consideration of the issues."

Documents relating to the cross-complaint serve as a good example of the failure to comply with this rule. Although it was later dismissed and has no relevance to the issues on appeal, the appendix includes not only the initial cross-complaint, but the first amended cross-complaint, the answer thereto, and an amended answer. The preliminary injunction, also not a subject of this appeal, amounts to some 700 unnecessary pages in the appendix which contains all of the law and motion documents, including evidence, evidentiary objections, and proofs of service.

We could easily provide several more examples of unnecessary documents not required by California Rules of Court, rule 8.124(b)(1)(A) in the appendix, but we trust that we have made our point: appendices must comply with rule 8.124(b)(3)(A), and the failure to do so subjects the violating party to potential sanctions (rule 8.124(g)). (Further, we note that utilizing this court's voluntary e-briefing program, while not required, would be of particular utility in cases involving voluminous records.)

possible alternatives. Mariners filed an additional submittal in July 2007, including a report which stated that the lack of a traffic signal would result in issues with adjacent signals. In August, Caltrans once again denied Mariners's application, again disagreeing with Mariners's arguments about the necessity of a traffic light.

Mariners did not continue its submissions to Caltrans thereafter, apparently believing that the result was unlikely to change. Further, based on the preliminary injunction, Mariners decided it could not proceed with the project, which required a traffic light under article 6(a), by developing a new plan that did not include a traffic light. Mariners then waited until June 30, 2008, and sent a letter terminating the lease under article 3. To date, nothing has been built on the property.

The case proceeded to trial in August 2008. Mariners moved for nonsuit in September, arguing, as pertinent to this appeal, that under article 3, either party had the right to terminate if the lease had not commenced by June 30, 2008. Mariners's motion did not rely on article 53, which gave it a right to terminate if the financing and entitlement contingencies were not satisfied by June 1, 2006.

Rite Aid opposed, arguing that the jury must decide if Mariners breached the lease in 2007 before the court could determine if a right to terminate on June 30, 2008, existed. Rite Aid argued that the attempted termination in March 2007 under article 53 was an anticipatory breach, which deprived Mariners of the right to rely on article 3 to terminate later. Further, Rite Aid claimed Mariners lost the right to terminate by "prematurely ceasing efforts to construct the Rite Aid store" in violation of the lease and that Mariners's proposed interpretation of article 3 rendered the contract absurd. Finally, Rite Aid argued that it had the right to defer the commencement date under article 3.

The court granted Mariners's motion for nonsuit, finding that Mariners "validly exercised its right to terminate the Lease pursuant to Article 3 thereof by sending written notice of termination to [Rite Aid] on July 1, 2008, thereby ending any and all further obligations owed by the parties under the Lease . . . ." Judgment was entered on October 2, 2008. The court subsequently denied Rite Aid's motion for new trial.

After the judgment was entered, Rite Aid filed a motion to tax costs, including $83,340.75 in expert witness fees for experts that had not been ordered by the trial court. Specifically, Rite Aid argued such costs had not been specially pled and proved at trial. At the hearing on the motion, the trial court granted Mariners $158,334.19, including the disputed expert witness

fees. Pursuant to stipulation, Rite Aid agreed not to challenge the remainder of the award, but reserved the right to appeal the $83,340.75 in expert witness fees.

## II

## DISCUSSION

### A. *Nonsuit*

■ We review an order granting a nonsuit de novo. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1124 [76 Cal.Rptr.3d 585].) A defendant is entitled to a nonsuit if the trial court determines the evidence presented by the plaintiff is insufficient to permit a jury to find in his or her favor as a matter of law. (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].)

"The interpretation of a written instrument, even though it involves what might properly be called questions of fact . . . is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. . . . It is . . . solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839], citations omitted; see also *New Haven Unified School Dist. v. Taco Bell Corp.* (1994) 24 Cal.App.4th 1473, 1483 [30 Cal.Rptr.2d 469].)

■ We begin our review with some basic principles of contract interpretation. We must interpret a contract so as to give effect to the mutual intent of the parties at the time the contract was formed. (Civ. Code, § 1636.) "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (Civ. Code, § 1638.) Courts must also endeavor to give effect to every part of a contract, "if reasonably practicable, each clause helping to interpret the other[s]." (Civ. Code, § 1641.)

Article 3 was a freely negotiated provision between sophisticated parties. Its first clause, the part relevant here, states: "If, for any reason (other than delays caused by Tenant) the Lease Term has not commenced by June 30, 2008, Tenant and Landlord shall each have the right to terminate this Lease by giving written notice to the other . . . ." The trial court concluded that "Article 3 meant what it said," and therefore Mariners was entitled to terminate the lease pursuant to article 3's terms.

■ Rite Aid now argues that the drafts of the lease exchanged between the parties require a different interpretation, specifically, "that the parties intended that *only Rite Aid* be given a right to terminate if Mariners failed to complete construction by June 30, 2008." Such an interpretation, however, would be legally untenable. Under the parol evidence rule, when a contract is integrated (as this one is under art. 46), extrinsic evidence cannot be used to vary or contradict the instrument's express terms. (Code Civ. Proc., § 1856; *Cerritos Valley Bank v. Stirling* (2000) 81 Cal.App.4th 1108, 1115–1116 [97 Cal.Rptr.2d 432].) This rule is based on sound logic and policy; when a contract is reduced to writing, it is presumed to contain all of the material terms, and it cannot reasonably be presumed that the parties would intend two contradictory terms to be part of the same agreement. (*Gerdlund v. Electronic Dispensers International* (1987) 190 Cal.App.3d 263, 271 [235 Cal.Rptr. 279] (*Gerdlund*).)

Further, even if a contract is not integrated, extrinsic evidence cannot be used to contradict the contract's terms unless the language is "reasonably susceptible" to the proposed interpretation. (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 40 [69 Cal.Rptr. 561, 442 P.2d 641].) Indeed, unless the language is "reasonably susceptible" to the proposed meaning, extrinsic evidence cannot even be considered to explain or otherwise shed light upon the parties' intent. (*Gerdlund, supra*, 190 Cal.App.3d at p. 272.)

Here, Rite Aid's proposed interpretation is that only Rite Aid had the right to terminate under article 3. The express language of article 3 ("Tenant and Landlord shall each have the right to terminate . . .") is not "reasonably susceptible" to an interpretation which limits the termination right to one party. Parol evidence cannot be used "to flatly contradict the express terms of the agreement. [Citation.] Thus if the contract calls for the plaintiff to deliver to defendant 100 pencils by July 21, 1992, parol evidence is not admissible to show that when the parties said 'pencils' they really meant 'car batteries' or that when they said 'July 21, 1992' they really meant May 13, 2001." (*Consolidated World Investments, Inc. v. Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 379 [11 Cal.Rptr.2d 524].) Article 3 is simply not "reasonably susceptible" to such an interpretation, and it must be rejected.

■ We also reject Rite Aid's arguments that the implied covenant of good faith and fair dealing prevents giving article 3 a plain language reading. The implied covenant cannot contradict the express terms of a contract. (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374 [6 Cal.Rptr.2d 467, 826 P.2d 710] ["We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an

agreement."].) Similarly, the implied covenant cannot be used to limit or restrict an express grant of discretion to one of the contracting parties.[5] (*New Hampshire Ins. Co. v. Ridout Roofing Co.* (1998) 68 Cal.App.4th 495, 504 [80 Cal.Rptr.2d 286].) When the contract is unambiguous, "[n]o obligation can be implied . . . which would result in the obliteration of a right expressly given under a written contract." (*Gerdlund, supra,* 190 Cal.App.3d at p. 277.)

Rite Aid also contends that reading article 3 literally would mean this situation is one of the "relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement." (*Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 808 [48 Cal.Rptr.2d 747] (*Third Story Music*).)[6] By giving article 3 its plain language meaning, Rite Aid argues, Mariners's "unqualified obligation" to construct the shopping center was rendered illusory.

We disagree. *Third Story Music* involved a simple promise on one party's part to sell a product in exchange for a fixed sum of money and the right to receive a percentage of the amount earned by a third party assignee from its exploitation of the music. The contract provided that the assignee could " 'at [its] election' " refrain from marketing and selling the music. The court noted that the assignee's promise was illusory, but supported by the fixed minimum as consideration. Thus, Third Story Music could not maintain a cause of action for breach of the implied covenant based on the assignee's alleged failure to exercise its discretion in good faith. (*Third Story Music, supra,* 41 Cal.App.4th at pp. 801–802, 808–809.)

This case, obviously, is quite different. Promises of future performance on each side were exchanged, although by the nature of the contract, Rite Aid would have few or no obligations to perform for years, while Mariners was required to invest large sums of money very quickly to develop the property. As part of the lease, the parties negotiated provisions to cover various contingencies, including the three separate termination clauses, one of which was mutual (art. 3) and two of which were one-sided (art. 53 on Mariners's part, and art. 6(b) on Rite Aid's part). Unlike the contract in *Third Story Music*, Mariners's performance, as expressly stated in the lease, was contingent on a variety of government approvals, without which it could not proceed. Further, article 6(c) specifically required Mariners to "diligently prosecute" construction to completion, and even Rite Aid's own evidence

---

[5] *April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805 [195 Cal.Rptr. 421], a case relied upon by Rite Aid, is distinguishable. In that case, the implied covenant of good faith and fair dealing was used to interpret a contract that was inherently contradictory, which is not the case here.

[6] As our discussion of the case will show, *Third Story Music* was not one of those "relatively rare instances" either, and the court's comment is therefore dicta.

demonstrates that Mariners took steps to gain the necessary approvals to complete the shopping center to discharge its obligations under article 6.

■ Thus, this is not one of the "relatively rare instances" (*Third Story Music, supra*, 41 Cal.App.4th at p. 808), where reading a contract's provision literally would render it illusory—there were explicit promises included in the lease, and the termination provisions were part of freely negotiated contingencies. Indeed, the court in *Third Story Music* noted: " 'The courts cannot make better agreements for parties than they themselves have been satisfied to enter into or rewrite contracts because they operate harshly or inequitably. It is not enough to say that without the proposed implied covenant, the contract would be improvident or unwise or would operate unjustly. Parties have the right to make such agreements. The law refuses to read into contracts anything by way of implication except upon grounds of obvious necessity.' [Citation.] [Third Story Music] was free to accept or reject the bargain offered and cannot look to the courts to amend the terms that prove unsatisfactory." (*Third Story Music, supra*, 41 Cal.App.4th at p. 809.)[7]

■ Further, courts have held that a contract with a mutual termination provision is not illusory when conditioned on notice. (*Roehm Distrib. Co. v. Burgermeister Brewing Corp.* (1961) 196 Cal.App.2d 678, 682–683 [16 Cal.Rptr. 881] (*Roehm*).) In *Roehm*, the parties had an oral agreement under which the plaintiff would distribute the defendant's product, which was later confirmed by two letters. (*Id.* at pp. 679–680.) The letters confirmed that either party could terminate the agreement " 'at any time, by written notice to that effect.' " (*Id.* at p. 680.) The defendant terminated the contract by written notice, and the plaintiff sued. The defendant was granted summary judgment, and the plaintiff, among other things, claimed that the contract was illusory, arguing that the right to terminate at any time rendered the contract illusory. (*Id.* at pp. 682–683.)

The court rejected this contention, noting that until notice of termination was provided, there was mutuality of obligation. "Each had the right to terminate on written notice. Mutuality was present in all parts of the contract; nothing was unilateral. Such a contract is binding on the parties until written notice of termination has been given. Both had not only the right but the mutual duty to give written notice to the other if they desired to terminate the relation. [Citations.]" (*Roehm, supra*, 196 Cal.App.2d at p. 683.) The same principle holds true in this case. Unlike the cases in which contracts have been declared illusory, in this case, each party had the right to terminate, and

---

[7] For similar reasons, we disagree that giving article 3 its plain language meaning renders article 6 "surplusage." A fair reading of the contract as a whole makes clear that despite Mariners's duty to construct the center, the parties both wanted an "escape clause" in the event the lease could not commence by June 30, 2008.

the rest of the lease included mutual obligations as well. The lease was binding until it was terminated according to its terms. Thus, we find the lease was not illusory. It included the termination clauses, which were freely negotiated, to effectuate the mutual intent of the parties.

Rite Aid next argues that Mariners lost the right to terminate under article 3 when it "repudiated the lease and stopped construction of a Rite Aid store" on March 21, 2007. Rite Aid omits, of course, the fact that it had filed the instant lawsuit against Mariners in November 2006, at which time any reasonable party would call into question the viability of a continuing business relationship. Nonetheless, even if Mariners's actions constitued an attempted repudiation, the evidence demonstrated that Mariners continued to spend time and money to gain the necessary approvals and proceed with building the center. Thus, despite any attempted repudiation, Mariners continued to act as if there were a contract with Rite Aid until at least August 2007, the time of Caltrans's fourth and final denial. We therefore disagree with Rite Aid that this is a case in which one party absolutely repudiates a contract and relies on a later condition to escape liability.

██ Thus, we come at last to the court's construction of article 3, and agree that it "meant what it said." "The term 'any reason' is plainly all-inclusive, encompassing all reasons '*of whatever kind*,' good, bad, or indifferent. [Citation.]" (*Gerdlund, supra*, 190 Cal.App.3d at p. 273.) The parties freely negotiated a provision under which either could terminate the lease—"for any reason"[8] if the lease did not begin by June 30, 2008. That provision must be given effect, and we cannot read it out of the lease simply because one party feels its operation was harsh or unfair. (*Third Story Music, supra*, 41 Cal.App.4th at p. 809.)

██ Rite Aid then argues that even if Mariners had the right to terminate the lease, it is entitled to damages because of the antecedent defaults, in March 2007 and the default on completing construction in article 6. We have already stated our disagreement that the alleged attempted repudiation in March 2007 constituted a repudiation or default. With respect to Mariners's default by failing to complete construction, the lease itself limits Mariners's liability: "Tenant shall be entitled to sue Landlord for damages (but not consequential or punitive damages or loss of profits) . . . ." Liability for default, however, does not persist after a valid termination under the lease—if it did, it would be as if there were no valid termination. (See *Martin v. U-Haul Co. Of Fresno* (1988) 204 Cal.App.3d 396, 406–408 [251 Cal.Rptr. 17].)

The damages that remain, therefore, are the "benefit of the bargain" type damage *prior* to termination. Indeed, Rite Aid asserts its damages relate to

---

[8] The language of the provision states "any reason (other than delays caused by Tenant)"—and no such delays are at issue here.

the fair rental value of the property exceeding the rent due under the lease. Rite Aid, however, had no expectation of having any benefit of the bargain prior to the completion of construction, which was due on June 30, 2008, under article 6(c) of the lease. At that time, the lease was terminated according to its terms. The damages a plaintiff is most likely to suffer in a case such as this one relate to the time and effort it took to plan for the future occupancy of the shopping center—for example, the staff time required to monitor the project and work with Mariners on the prospective rental space. But these are consequential damages and specifically made unavailable under the lease. Therefore, we agree with Mariners that Rite Aid has not suffered any recoverable damages.

### B. *Expert Witness Fees*

As noted above, article 33.1 of the lease states that the prevailing party is entitled to "reasonable expenses" including attorney fees, "court costs, witness and expert fees." The trial court denied Rite Aid's motion to tax expert witness costs amounting to $83,340.75.

██ Code of Civil Procedure section 1033.5 permits expert witness fees to be allowed as costs only if the expert witness is ordered by the trial court. (Code Civ. Proc., § 1033.5, subd. (a)(8).) Expert witness fees, when the expert witness has not been ordered by the court, are allowed only "when expressly authorized by law." (Code Civ. Proc., § 1033.5, subd. (b)(1).) Generally, when a contract provision states only that a prevailing party is entitled to " 'reasonable attorney's fees and costs,' " or similar nonspecific language, courts have held that such language must be interpreted in light of the limits set forth in Code of Civil Procedure section 1033.5. (*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 491 [54 Cal.Rptr.2d 888] (*Arntz*).) Nevertheless, "[w]hile it is reasonable to interpret a general contractual cost provision by reference to an established statutory definition of costs, we do not discern any legislative intent to prevent sophisticated parties from freely choosing a broader standard authorizing recovery of reasonable litigation charges and expenses." (*Id.* at p. 492.)

Rite Aid does not argue that a mutually agreed-upon provision permitting the recovery of expert witness fees is unenforceable, but argues that Mariners did not follow the proper procedure for recovering such fees. Specifically, Rite Aid argues, Mariners did not specially plead and prove its expert witness costs at trial. Rite Aid relies on *Carwash of America-PO v. Windswept Ventures No. 1* (2002) 97 Cal.App.4th 540 [118 Cal.Rptr.2d 536] (*Carwash*). In that case, the defendant prevailed at summary judgment, and sought expert witness fees as an item of costs pursuant to a provision in the contract allowing the prevailing party to recover " 'all reasonable costs incurred in connection with

such litigation, including, without limitation, reasonable attorneys' fees.' "[9] (97 Cal.App.4th at p. 542.) The court held that expert witness fees were not recoverable as an item of costs: " '[T]he Legislature has chosen to provide for the recovery of contractual attorney fees in a cost award. [Citations.] But the Legislature has declined to adopt that procedure for the recovery of expert witness fees. [Citation.] Accordingly, assuming expert witness fees may be recovered under a contractual provision, they must be specially pleaded and proven at trial rather than included in a memorandum of costs.' [Citation.] In other words, while the parties may agree to allow recovery of expert witness fees by the prevailing party, this is a matter that must be pleaded and proven at trial rather than submitted in a cost bill. [Citations.]" (*Id.* at p. 544.)

We respectfully disagree with the court's conclusion in *Carwash*, at least as Rite Aid would seek to apply it in this particular case. While the Legislature has not adopted a specific provision addressing the recovery of expert witness fees, such fees are, indeed, a cost, and when "expressly authorized by law," they are "allowable as costs" under Code of Civil Procedure section 1033.5, subdivision (b)(1). We therefore see no reason why they should not be recoverable as costs when the parties specifically agree to such a provision in a freely negotiated contract.

This does not mean—and we do not hold—that expert witness fees are recoverable in every case where "costs" are merely mentioned in a contract. A general cost provision should be interpreted according to the established statutory definition. (*Arntz, supra,* 47 Cal.App.4th at p. 492.) But where sophisticated parties knowingly and intentionally negotiate a broader standard into their contract—and particularly where, as here, that standard specifically includes "witness and expert fees"—the intent of the parties should be upheld by the court.

We see no reason why that intent cannot be effectuated through the normal procedures for requesting and taxing costs. The prevailing party must establish it is entitled to recover such costs under the contract. If there is any issue as to whether the amount sought was actually incurred and whether that amount is reasonable, it can be addressed in a motion to tax costs or at an evidentiary hearing, if the court deems it necessary. Rite Aid does not argue that Mariners was not entitled to recover under the lease or that the amount of expert witness fees requested was unreasonable. Instead, it simply argues that Mariners was required to specially plead and prove its expert witness fees "at trial" rather than through the costs procedure.

[9] The case upon which *Carwash* principally relied, *Ripley v. Pappadopoulos* (1994) 23 Cal.App.4th 1616 [28 Cal.Rptr.2d 878], included similar language, entitling the prevailing party to " 'reasonable attorney's fees and costs.' " (*Id.* at p. 1621.)

To require specially pleading and proving such costs "at trial," especially in a situation where a defendant prevailed outside of or before trial, would frustrate the intent of parties who deliberately chose to include expert witness fees as an item of costs, not an item of special damages, in their contract.[10] As Mariners pointed out at oral argument, it seems counterproductive, if not slightly absurd, to keep a jury empanelled after nonsuit has been granted for the sole purpose of determining the reasonable value of expert witnesses it never heard testify at trial. Thus, we deem it unnecessary to specially plead and prove expert witness fees, at least in a case where expert fees are explicitly included in the contract as recoverable costs. We therefore find the trial court did not err by allowing Mariners to recover its expert witness fees pursuant to the lease.

## III

## DISPOSITION

The judgment and postjudgment order are affirmed. Mariners is entitled to its costs on appeal.

Sills, P. J., and Rylaarsdam, J., concurred.

A petition for a rehearing was denied July 13, 2010, and appellant's petition for review by the Supreme Court was denied September 22, 2010, S184990.

---

[10] Indeed, if the point of specially pleading expert witness costs is to put the other party on notice that such costs may be sought, then including a specific provision in the contract is sufficient to provide notice. It is, in fact, more than mere notice, but is a specific agreement that such costs may be sought by the prevailing party.