Filed 1/12/15  Thrifty Payless v. Mariners Mile Gateway CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THRIFTY PAYLESS, INC., | |
| Plaintiff and Respondent, | G048531 |
| v. | (Super. Ct. No. 06CC11888) |
| MARINERS MILE GATEWAY, LLC et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from an order of the Superior Court of Orange County, David T. McEachen, Judge.  Affirmed.

Burkhalter Kessler Clement & George and Daniel J. Kessler for Defendants and Appellants.

Lurie, Zepeda, Schmalz & Hogan, Wayne C. Arnold, Robert W. Denton and Shawn M. Ogle for Plaintiff and Respondent.

\*          \*          \*

This is the second appeal after judgment in this dispute about a lease for commercial property. Tenant Thrifty Payless, Inc., doing business as Rite Aid (Rite Aid), sued the landlord, defendant Mariners Mile Gateway, LLC (Mariners) about its lease in a proposed shopping center called Bel Mare along Pacific Coast Highway in Newport Beach. Mariners eventually terminated that lease and Rite Aid sued. While the case was pending, Rite Aid sought and obtained temporary injunctive relief from the trial court and posted a $5 million bond. Mariners won at trial, and we later affirmed the trial court's decision on appeal. (*Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal.App.4th 1050 (*Thrifty I*).)

After Mariners prevailed at trial, the trial court dissolved the injunction. Mariners brought a posttrial motion to enforce liability on the bond, arguing it had lost development opportunities due to the injunction. The trial court found in Rite Aid's favor, concluding Mariners had not been prohibited from continuing the development and financing of the shopping center during the pendency of the injunction, and that other factors had prevented it from doing so. The court also concluded, accordingly, that Mariners was not entitled to damages for its lost profits. We agree and therefore affirm.

I

FACTS

The facts of the underlying dispute are laid out in some detail in *Thrifty I*, *supra*, 185 Cal.App.4th at pp. 1053-1060, and we shall not repeat them in any detail here. Suffice to say that Rite Aid entered into a lease with Mariners for a new drug store at the Newport Beach site. The contract, signed in 2005 (*id.* at p. 1055), included a clause that unless the lease began by June 30, 2008, either party could terminate "for any reason." (*Id.* at p. 1053.) Numerous problems arose, and Rite Aid filed suit in December 2006, alleging anticipatory breach of the lease, among other things. (*Id.* at p. 1057.)

In April 2007, Rite Aid filed an application for a preliminary injunction against Mariners, seeking to "preserve the status quo." On May 17, the court granted the

2

application.  The minute order stated Mariners was "prevented from (1) leasing all or part of the property located at NWC W. PCH and Dover Drive ('Lease Property') to any entity other than [Rite Aid] during the course of this litigation, or (2) developing, improving altering, or constructing the Lease Property in any way inconsistent or not in accordance with the lease agreement that is the subject of this litigation."  Rite Aid was required to post a $5 million undertaking.

On May 31, the court signed the order granting a preliminary injunction restraining Mariners from:  "A.  Leasing to any entity other than [Rite Aid] all or a part of the property Mariners previously leased to [Rite Aid] on August 4, 2005, located at NWC West Coast Pacific Highway and Dover Drive, Newport Beach, California; and [¶] B. Developing, improving, altering or constructing all or a part of the property Mariners previously leased to [Rite Aid] on August 4, 2005, located at NWC West Coast Pacific Highway and Dover Drive, Newport Beach, California, in any way inconsistent or not in accordance with [Rite Aid] and Mariners' lease."  The language of the preliminary injunction was therefore somewhat different, and narrower, than the language in the minute order.

Over a year later, Mariners exercised the cancelation provision and notified Rite Aid it was terminating the lease on or about June 30, 2008.  (*Thrifty I*, *supra*, 185 Cal.App.4th at p. 1059.)

The case proceeded to trial in August 2008, (*Thrifty I*, *supra*, 185 Cal.App.4th at p. 1059), and after Rite Aid concluded its case, Mariners moved for nonsuit, which the court granted.  The trial court found "Mariners 'validly exercised its right to terminate the Lease pursuant to Article 3 thereof by sending written notice of termination to [Rite Aid] on July 1, 2008, thereby ending any and all further obligations owed by the parties under the Lease. . . .'"  (*Ibid.*)  In September, the court dissolved the injunction.  Judgment was entered on October 2, 2008.  The court subsequently denied Rite Aid's motion for new trial.

3

Rite Aid appealed, and in June 2010, we affirmed the trial court's ruling, disagreeing with Rite Aid's main contention that a contract provision stating the agreement could be canceled "for any reason" should be given an interpretation other than its plain meaning. (*Thrifty I*, *supra*, 185 Cal.App.4th at pp. 1060-1065.)

In September 2011, Mariners filed a second notice of intent to file a motion to collect on the bond.[1] Mariners alleged total damages of $45 million, and therefore sought the full $5 million of the bond. The motion was set for a bench trial, which began in January 2013. The crux of Mariners's argument was that if the injunction had not been in place, it would have begun developing a smaller version of Bel Mare by August 2007 and obtained financing as late as May 2008. According to Mariners, its March 2008 plan for "New Bel Mare" consisted of only one story with about 37,000 square feet of leasable space, and would have eliminated the proposed subterranean parking. Further, a traffic signal, a major point of contention in obtaining approval for the original project, would no longer be needed. Instead, it argued, by the time the injunction was lifted, the 2008 financial crisis had begun, requiring Mariners to drastically and detrimentally reconsider its plans for the property.

At the conclusion of the trial, the court invited the parties to submit proposed statements of decision in lieu of briefs and argument, and they did so. The court then issued its statement of decision and judgment, which we discuss below in detail due to its importance in this appeal. The court framed the issues as: "1. Whether the preliminary injunction rendered Defendant MARINERS unable to obtain, or seek to obtain, all necessary entitlements, authorizations, approvals, and construction financing required for developing New Bel Mare by June 30, 2008; and [¶] 2. Whether the injunction caused defendant MARINERS to sustain lost rental profits of $5 million; . . ."

---

[1] The first motion, filed while the appeal was still pending, was apparently withdrawn after Rite Aid argued it was premature.

4

The court concluded Mariners failed to prove the injunction barred it from proceeding with planning and other predevelopment steps for New Bel Mare. The court rejected Mariners's claim the injunction "completely froze the property, including any pre-development activity," concluding the injunction "was not so restrictive." The court noted that if Mariners "did not understand the scope of the injunction or had questions about it, they could have come into court asking for clarification. Rather, the injunction only prevented MARINERS from developing the 13,900 sq. ft. property previously leased to [RITE AID] 'in any way that was inconsistent or not in accordance with [RITE AID] and MARINERS' lease.' In other words, in no way did the injunction prevent MARINERS from developing New Bel Mare; it only prevented MARINERS from developing New Bel Mare in a way that was inconsistent with the lease."

The New Bel Mare site plans, the court decided, were not inconsistent with the lease. The plans did not change either the size or location of the leased property, but only made design changes including eliminating the traffic signal and underground parking, and reducing the overall size of the shopping center. "After hearing all the evidence, the Court finds that MARINERS failed to prove by a preponderance of the evidence that it was the injunction, and no other factors, which caused MARINERS to abandon its plans for developing New Bel Mare."

The court continued: "First, before developing New Bel Mare, uncontroverted evidence was presented that MARINERS needed to complete a number of pre-development steps, which included: 1) obtaining all necessary entitlements, authorizations, and approvals from the City of Newport Beach ('City'); and 2) obtaining construction financing. To obtain the entitlements, a complete site plan needed to be submitted to the City. . . . The evidence showed, however, that no site plan for New Bel Mare was ever submitted. When MARINERS was asked why the site plan was never submitted for approval, it simply responded with the conclusory assertion that the injunction prevented such action. Yet, no evidence established that it was the injunction

5

that prevented MARINERS from submitting its site plan to the City for approval. Instead, the evidence showed that MARINERS didn't submit a final site plan to the City because it was still making design modifications. . . . Numerous email communications attested to this fact. Moreover, as [RITE AID] aptly pointed out in its closing trial briefs, none of these email communications ever referred to the injunction or to actions that would be taken once the injunction was lifted. In fact, none of the emails ever contained the word 'injunction.' Thus, the reasonable inference is that MARINERS never considered the injunction to be the sole inhibitor of its pre-development and development plans for New Bel Mare."

Additionally, the court stated, the evidence demonstrated Mariners "failed to submit a site plan because it was still fine-tuning the logistics of parking, drainage, and the absence of a traffic signal for ingress and egress from the shopping center. Indeed, MARINERS had worked for nine months on creating a site plan that would be approved by the City and had yet to complete the site plan and application for entitlements."

The court concluded the evidence showed "that because entitlement timetables are inherently imprecise (due to the myriad variables involved in the process), MARINERS would not have been able to entitle New Bel Mare in time to complete development before the 2008 financial crisis. As stated by [RITE AID], in order for MARINERS' predictions to come true and complete its entitlements before the 2008 financial crisis, they would have to start with a near perfect plan and have everything go just right with the changes, a most unlikely situation."

While the court recognized the "chilling effect" injunctions can have in such situations, the evidence in this case had failed to "mention — much less prove — that the injunction in this case chilled all pre-development actions. Therefore, the Court finds that the injunction did not prevent MARINERS from submitting a site plan for New Bel Mare to the City. Thus, the failure to obtain the necessary entitlements was not caused by the injunction."

6

Moreover, the court found that Mariners had also failed to secure lease agreements from prospective tenants for New Bel Mare, and the evidence failed to establish this was due to the injunction. The letters of interest it had received had never become binding leases. While Mariners claimed it never executed any leases because lawyers had advised doing so would violate the injunction, it never produced evidence of this advice, and witnesses could not recall when they received it. Further, just four months after the court issued the injunction, Mariners's attorneys began drafting a lease with a prospective restaurant tenant. Mariners, therefore, "is 'arguing out of both sides of its mouth.'" Mariners's head of leasing had never informed his leasing director the injunction forbid him from doing anything.

Mariners had also, the court concluded, failed to prove its ability to obtain construction financing was due to the injunction. Mariners's own expert testified the financial markets had tightened by May 2008, some four months before the financial crisis, which was just about the time Mariners would have been seeking construction financing. This was consistent with Rite Aid's expert, who testified the markets were worsening by 2008, perhaps as early as 2007. While Mariners presented evidence it would have accepted a loan from California Bank & Trust (CB&T), the letter Mariners received from CB&T indicated it was merely an expression of interest and not a lending commitment. CB&T's representative testified that to commit funds, CB&T would have required a site plan from Mariners including extensive documentation, including "blue prints, soil reports, environmental reports, third-party appraisal, pro-forma showing of financial feasibility, borrower's financial information, guarantor's financial information, proposed construction budget, utility will-serve letters, proof of entitlements, a building permit, executed leases sufficient to meet the pre-leasing requirement, and financial statements from the prospective tenants." Only some of these requirements had been met, and Mariners never actually applied for the loan. Therefore, "it would be pure speculation as to whether [CB&T] would have even granted the loan to MARINERS,"

7

and Mariners failed to prove it was the injunction that prevented it from securing construction financing.

Moving onto the second question of whether the injunction caused Mariners to sustain damages of $5 million, the court found it was moot, because Mariners had failed to establish the injunction had caused it any damages or lost profits. "The Court finds that MARINERS claim of lost profits arising from its alleged inability to develop New Bel Mare as a result of the injunction is far too speculative to form a basis for a claim of lost profits." Among other factors, the court considered the evidence that Bel Mare was Mariners first and only shopping center, and the only one attempted by the principals in Newport Beach. The court also found the lost profits claim was based on "too many tenuous assumptions. First, MARINERS assumes that leasing activity would have commenced by August 2007, and that by March 2008, MARINERS would have successfully obtained executed leases for the drug store space, plus 50 percent of the other shop spaces within six months, thereby satisfying its pre-lease requirements to secure construction financing. However, these assumptions are mere speculation and conjecture. In reality, as discussed above, MARINERS failed to secure a single lease with any prospective tenant." Further, the court noted, there were no comparable shopping centers in Newport Beach, thereby making it almost impossible to predict prospective profits. Accordingly, the court denied Mariners's motion to recover damages on the injunction bond.

## II

## DISCUSSION

### A. Interpretation of the Injunction

For ease of reference, we repeat the language of the preliminary injunction issued on May 31, 2007. Mariners was restrained from: "A. Leasing to any entity other than [Rite Aid] all or a part of the property Mariners previously leased to [Rite Aid] on August 4, 2005, located at NWC West Coast Pacific Highway and Dover Drive, Newport

8

Beach, California; and [¶] B. Developing, improving, altering or constructing all or a part of the property Mariners previously leased to [Rite Aid] on August 4, 2005, located at NWC West Coast Pacific Highway and Dover Drive, Newport Beach, California, in any way inconsistent or not in accordance with [Rite Aid] and Mariners' lease." Mariners's primary argument below, as it is here, is that every version of New Bel Mare altered the premises in a manner inconsistent with the lease that prohibited new development activity, resulting in its damages.

### 1. Standard of Review

Mariners argues that because the language of the injunction is not in dispute, we must review this and the surrounding issues de novo. While the language was not in dispute, its meaning certainly is. "The meaning and effect of a judgment are determined according to the rules governing the interpretation of writings generally." (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 766.) We see no reason an injunction should be treated differently than a judgment or other court order. "[T]he entire document is to be taken by its four corners and construed as a whole to effectuate the obvious intention. [Citations.]" (*Lazar v. Superior Court* (1940) 16 Cal.2d 617, 622.) We only conduct a de novo review only if the language is unambiguous. (*Fox v. Fox* (1954) 42 Cal.2d 49, 52.)

Indeed, Mariners seems to concede the ambiguity of the language. In its opening brief, it complains the injunction "loosely referred" to the property and incorporated none of the terms of the lease. Thus, the injunction is ambiguous in the sense that it does not stand on its own feet; it refers to language elsewhere that must, accordingly, be interpreted and applied. Both parties advanced their own meaning of the relevant lease provisions during the hearing on the motion. Extrinsic evidence was therefore proper to interpret the injunction. "When the competent extrinsic evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction

9

will be upheld if it is supported by substantial evidence. [Citations.]" (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956.)

"'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citations.]" (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) We do not reweigh evidence or reassess the credibility of witnesses. (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622.)

### 2. *Meaning of Disputed Language*

The key disputed language is what constitutes "all or a part of the property Mariners previously leased to [Rite Aid] . . . ." According to Mariners, this prevented virtually all development in the entire center.

The language of the lease states: "Landlord hereby leases to Tenant the premises measuring approximately 13,000 square feet (the entirety thereof referred to hereinafter as the 'Leased Premises') located in the shopping center (the Center) . . . . All portions of the Leased Premises which are located outside of the exterior walls of the Building, including landscaping (if any), sidewalks, and the parking area (the 'Outside Area') which are not covered by buildings or landscaping shall be common areas for the non-exclusive use of Tenant and its customers and invitees." Mariners, citing the testimony of one its own witnesses, therefore asserts the "Leased Premises" included both the 13,000 square foot property and the "Outside Area."

The trial court saw matters differently, and interpreted the injunction as merely preventing development of the 13,000 square foot "box" that had been the area exclusively leased to Rite Aid. Rite Aid argues, and we agree, this was a reasonable interpretation based on the language of the injunction itself. The key language — "all or a part of the property Mariners previously leased to [Rite Aid] . . . " is certainly

10

reasonably susceptible to this common sense meaning. The term "Leased Premises" in the lease itself defines those premises as only the 13,000 square foot building. The "Outside Area" is specifically defined as for the nonexclusive use of Rite Aid. The court interpreted the injunction as simply referring to the exclusive use area rather than nearly the entire center, the rather tortured interpretation Mariners attempts to offer. Thus, making changes to the rest of the property was not "in any way inconsistent or not in accordance with [Rite Aid] and Mariners' lease."

Other relevant evidence of the court's intent includes Rite Aid's initial request for an injunction. Rite Aid specifically described "the Lease Property" as "a full-size commercial site, measuring approximately 13,000 square feet, not including the common area outside of the store where [Rite Aid's] customers can park their cars." The preliminary injunction then ordered Mariners not to lease to anyone else or develop or improve "all or a part of the property Mariners previously leased to [Rite Aid] . . . ." There is no evidence the court had a broader meaning in mind than the one used by the applicant for the preliminary injunction.

Mariners points to its objection to the initial minute order the court issued as if it were somehow helpful. The initial minute order, issued on May 11, stated Mariners was "prevented from (1) leasing all or part of the property located at NWC W. PCH and Dover Drive ('Lease Property') to any entity other than [Rite Aid] during the course of this litigation, or (2) developing, improving altering, or constructing the Lease Property in any way inconsistent or not in accordance with the lease agreement that is the subject of this litigation." Mariners then argues the court "refused to modify its language." But this ignores the fact that the final language of the preliminary injunction was considerably narrower. Rather than enjoining Mariners from leasing "all or part of the property . . . to any entity other than [Rite Aid]" or developing it "in any way inconsistent or not in accordance with the lease agreement," the injunction's language prevented Mariners from leasing to anyone else or developing "all or a part of the

11

property Mariners previously leased to [Rite Aid]" in a manner inconsistent with the lease. This is significantly narrower language.

Mariners argues, apparently for the first time on appeal, that even if Rite Aid's interpretation of the injunction is correct, its site plan for New Bel Mare would have expanded the drug store space from 13,000 to 13,500 to 13,900 square feet. Even if one interpreted the injunction so literally that a slight *expansion* of the premises offered at the same price was impermissible, there was no evidence that providing exactly 13,000 square feet was literally impossible.

Rite Aid further argues, and we agree, that Mariners's conduct was inconsistent with the meaning of the injunction it now claims was in effect all along. It is noteworthy that Mariners never specifically asked the trial court to clarify what it could or could not do. In a filing relating to Mariners's exercise of its termination clause, Mariners asserted the injunction had prevented it from pursuing a new project on the site, but there is no evidence it asked the court if this was correct.

There was evidence, however, that Mariners did not act as if it was prevented from moving forward with the project. It was actively proceeding with a site plan for New Bel Mare. In March 2008, it had a new plan that had a 13,900 square foot store at one end of the center. David Goldman, Mariners's head of leasing, never informed his leasing director the injunction prevented him from marketing new leases for New Bel Mare. In fact, Goldman agreed they were running as hard as they could with the new site plan in an attempt to get it leased.

Taken as a whole, we find the trial court's interpretation was a reasonable construction supported by substantial evidence. (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, *supra*, 109 Cal.App.4th at p. 955.) Accordingly, we reject Mariners's claim it was prevented from taking any steps whatsoever to proceed with a new development plan. All it was enjoined from was altering was the approximately 13,000 square foot premises leased to Rite Aid.

12

*B.  Leasing, Financing, and Entitlements*

Because we agree with the trial court's interpretation of the injunction that it prevented only the releasing or redevelopment of the exclusive use area leased to Rite Aid, we move on to whether the trial court had substantial evidence to establish the injunction did not prevent Mariners from obtaining leases, financing, or entitlements. The evidence is more than sufficient for the court to reach this conclusion.

At trial, Mariners admitted it never obtained any executed leases or applied for entitlements for New Bel Mare.  It asserted it did not execute any leases because it was advised by counsel that to do so would violate the injunction.  But the trial court found Mariners's witnesses could not recall when they had received such advice, and their conduct belied reliance on it.  In September 2007, a few months after the injunction was issued in May, Mariners engaged outside counsel to begin drafting a lease with a restaurant and to solicit comments on it.  Goldman did not recall why negotiations with that restaurant broke down.

Mariners argued that prior to the injunction's issuance, it had obtained executed leases from five tenants for the original Bel Mare.  Four out of five of these leases were executed in 2005 and 2006, and the other was signed in March 2007, long before New Bel Mare was on the table.  None of these tenants agreed to transfer their leases to New Bel Mare.  There was no evidence the tenants' decisions were related to the injunction, but there was some evidence the tenants' decisions were due to the delay in opening and changes to the center.  In April 2007, Mariners signed a lease with Walgreens as a replacement tenant for Rite Aid.  It also negotiated letters of intent with a number of restaurants between May 2007 and April 2008.  As the court noted, these never became binding leases.  Rite Aid's expert testified that between 2007 and early 2010, Mariners was seeking rents significantly over the fair market value.  Thus, there was more than substantial evidence that Mariners's failure to lease the New Bel Mare

13

was not caused by the injunction, which only restricted the approximately 13,000 square feet leased by Rite Aid, but by numerous outside factors.

Further, there was substantial evidence the reason Mariners did not seek to entitle New Bel Mare was its inability to decide upon a new site plan prior to the 2008 financial crisis. Mariners began working on a new proposal in August 2007, after the injunction issued, following another rejection of a traffic signal by CalTrans. Soon after, it had a plan centered around a restaurant space on the second floor over a traffic circle. This plan was driven by the negotiations with a particular restaurant which eventually feel through, and yet work proceeded on this plan through October in preference for a plan involving rooftop parking. This plan was later rejected for the March 2008 plan, the plan Mariners contends they would have started in August 2007 if not for the injunction.[2]

The trial court found this argument not credible, and we agree. There was no evidence credited by the court that the March 2008 plan existed in 2007. Once the March 2008 plan did exist, Mariners estimated a six- to nine-month entitlement schedule. By May 1, it had no application ready. Six to nine months would have placed it right in the middle of the financial crisis. Indeed, once the injunction was lifted in September 2008, Mariners was still revising the plan and preparing the entitlement submittal package. The trial court had more than sufficient evidence to conclude the injunction was not the reason Mariners failed to entitle New Bel Mare before the September 2008 financial crisis.

Finally, with respect to financing, the trial court concluded the injunction had nothing to do with Mariners's inability to obtain financing for the project. Mariners's own expert testified that the finance markets had tightened by May 2008,

---

[2] This frenetic activity to move the project along even after the injunction issued further buttresses our conclusion that Mariners did not believe the injunction prevented such activity. Their explanation that this activity was mere preparation for proceeding once the injunction dissolved was simply not credible to the trial court, based on the deadlines given and the lack of reference to the injunction anywhere in the written documents.

14

about the same time Mariners was finally settling on a new site plan. While Mariners claimed it would have accepted a loan from CB&T discussed in a May 2008 letter of interest, that letter explicitly stated it was merely an expression of interest, and Mariners still had to qualify for the loan. To complete underwriting, CB&T's representative testified a complete site plan, proof of entitlements, and executed leases would have been needed. As discussed above, there was no evidence Mariners had any of the above before the financial crisis of September 2008. Therefore, the court had substantial evidence the injunction did not cause Mariners's inability to obtain financing.

## C. Lost profits

"The court's independent basis for rejecting [a party's] claims for damages based on the damages being speculative and not supported by the evidence will be affirmed if the ruling is supported by substantial evidence. [Citation.]" (*In re Estate of Kampen* (2011) 201 Cal.App.4th 971, 992.) We need not belabor this for long. Because the trial court found that the injunction was not the proximate cause of any damages, it properly decided not to award any. It therefore does not matter, as Mariners claims, whether the trial court used the wrong legal standard in determining lost profits, because it properly determined Mariners suffered no damages at all as a proximate cause of the injunction. Therefore, Mariners was not entitled to lost profits under any standard.

Finally, Mariners argues, for the first time, it was at a minimum entitled to $635,333 in interests and carry costs while the injunction was in effect. But this issue, too, must fall to the same defect as its lost profits argument — the trial court found the injunction did not prohibit Mariners from proceeding with development of New Bel Mare, and did not result in any damages. Therefore, Mariners is not entitled to carry costs any more than it is entitled to lost profits.

15

III

DISPOSITION

The order is affirmed.  Rite Aid is entitled to its costs on appeal.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


RYLAARSDAM, J.

16