Filed 3/8/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| APPLIED MEDICAL DISTRIBUTION CORPORATION,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>STEPHEN JARRELLS,<br><br>    Defendant and Appellant. | G062056<br><br>(Super. Ct. No. 30-2019-01049441)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Robert J. Moss and Michael J. Strickroth, Judges.  Affirmed in part, reversed in part, and remanded.

Jones Day, Nathaniel P. Garrett, Koree B. Wooley, David A. Phillips and Steven M. Zadravecz for Plaintiff and Appellant.

Forward Counsel, Michael E. Caspino and Michael W. Weiler for Defendant and Appellant.

Applied Medical Distribution Corporation (Applied) sued its former employee, Stephen Jarrells, for misappropriation of trade secrets, breach of a contract governing Applied's proprietary information, and breach of fiduciary duty. Applied also sued Jarrells's new employer, Bruin Biometrics, LLC (Bruin), for misappropriation and intentional interference with contract. A jury found both Jarrells and Bruin misappropriated Applied's trade secrets, but also found Applied had not been damaged and neither defendant had been unjustly enriched by the misappropriation. The jury found in favor of defendants on all other causes of action. The trial court granted Applied's posttrial motion for a permanent injunction and awarded Applied a portion of the attorney fees, costs, and expenses it requested. Both Jarrells and Applied appealed from the judgment. We affirm in part, reverse in part, and remand for further proceedings.

Jarrells argues Applied did not prevail on any cause of action so the trial court erred by entering a permanent injunction against him and awarding Applied attorney fees. We disagree on both counts. Applied was the prevailing party on the misappropriation cause of action and was entitled to a permanent injunction to recover its trade secrets and prevent further misappropriation. Under the plain language of the parties' proprietary information agreement, Applied was entitled to an award of the reasonable attorney fees, costs, and expenses it incurred to obtain injunctive relief.

Applied contends the trial court erred in several respects by awarding only a fraction of the requested attorney fees, costs, and expenses. We agree in part.

We conclude the trial court did not err by refusing to accept the assertion by Applied's counsel that it had already excluded from its attorney fee request all fees incurred for work for which an award was not authorized. The court was entitled to make that determination itself.

We further conclude the trial court did not err by determining Applied was entitled only to the attorney fees, costs, and expenses it reasonably incurred to obtain the

2

injunctive relief against Jarrells. Nevertheless, we find the court erred in how it went about determining the amounts awarded by (1) mechanically awarding only 25 percent of the incurred attorney fees and costs because Applied prevailed on only one of four claims it asserted and failing to address the extent to which the facts underlying the other claims were inextricably intertwined with or dependent upon the allegations that formed the basis of the one claim on which Applied prevailed; and (2) denying recovery of any attorney fees incurred for discovery and motion practice. We reverse on these issues and remand to allow the court to properly exercise its discretion to determine the reasonable amount of attorney fees and costs incurred by Applied to obtain injunctive relief.

Applied also argues the trial court erred by refusing to allow Applied to include, as part of its damages calculations at trial, the fees it paid to a computer forensics expert to determine the existence and extent of any trade secret misappropriation by Jarrells and to stop or mitigate the misappropriation. We hold a plaintiff in a misappropriation case may recover, as an element of damages, the expert fees it incurs to stop or mitigate misappropriation, but not the expert fees to investigate a suspected misappropriation. Applied offered evidence its forensics expert performed work to stop or mitigate Jarrells's misappropriation, and the court erred in excluding those expert witness fees from the damages calculation presented to the jury. As to other expert witness fees Applied incurred, we conclude the court did not err by denying Applied's request for such fees as part of its postjudgment cost memorandum.

Finally, Applied argues the trial court erred by granting a nonsuit on whether Jarrells's misappropriation was willful and malicious. We find there was evidence from which a reasonable jury could find a willful and malicious misappropriation. We reverse and remand for a jury trial on this issue. If the jury finds the misappropriation was willful and malicious, the court shall, in its discretion, decide whether attorney fees and costs should be awarded to Applied pursuant to Civil Code section 3426.4 and, if so, in what amount. If the jury awards damages for the costs

3

incurred by Applied to stop or mitigate the misappropriation, and further finds the misappropriation was willful and malicious, it may also consider whether exemplary damages should be awarded.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

Applied sells and distributes medical devices produced by its parent company, Applied Medical Resources. Jarrells began working for Applied as a director of academic medical centers in January 2011. At the time he was hired, Jarrells and Applied entered into a proprietary information agreement (Agreement).[1] As relevant here, the Agreement provided:

1. "I agree at all times during the term of my employment and thereafter to hold in strictest confidence, and not to use except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Board of Directors of the Company, any trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its clients, consultants or licensees."

2. "I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or

---

[1] During his tenure at Applied, Jarrells repeatedly was promoted, first to district sales manager, and then to director of corporate accounts, director of advanced energy education, and finally vice president in charge of group purchasing organizations.

4

reproductions of any [of the] aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or assigns."

3. "I agree that it would be impossible or inadequate to measure and calculate the Company's damages from any breach of the covenants set forth . . . herein. Accordingly, I agree that if I breach any of such Sections, the Company will have available, in addition to any other right or remedy available, the right to obtain an injunction from a court of competent jurisdiction restraining such breach or threatened breach and to specific performance of such provision of this agreement. I further agree that no bond or other security shall be required in obtaining such equitable relief and I hereby consent to the issuance of such injunction and to the ordering of specific performance. I further agree that if any such equitable relief is granted, I shall be obligated to reimburse the company for the reasonable attorneys fees, costs and expenses incurred in obtaining such relief."

In December 2018, Jarrells accepted a position as vice president of sales for Bruin, another medical device manufacturer. Before resigning from Applied in January 2019, Jarrells created a folder on his laptop computer titled "Good Stuff" and copied to it trade secrets and confidential information belonging to Applied. Jarrells transferred the contents of the "Good Stuff" folder onto a thumb drive and uploaded them to a computer issued to him by Bruin. Jarrells then wiped his Applied computer and network drives and returned his Applied computer to Applied. Jarrells shared Applied's documents with employees of Bruin.

Jarrells knew his actions violated the Agreement. He admitted he never told anyone at Applied about his actions or requested their permission because he "did not want the company to know what [he] had done."

After noticing a suspicious increase in the volume of downloads and transfers of data, Applied hired an outside forensics expert to investigate the nature and extent of what Jarrells had done.

In February 2019, one month after Jarrells resigned, Applied sued Jarrells for misappropriation of trade secrets and breach of the Agreement. Applied also filed an ex parte application for a temporary restraining order and a preliminary injunction. Applied and Jarrells stipulated to a preliminary injunction under which Jarrells agreed to (1) return all files containing Applied's business information and any devices on which such business information had ever been stored, (2) not destroy, manipulate, or alter any evidence, and (3) refrain from possessing, using, or disclosing Applied's business information while the injunction was in place. The stipulated injunction provided neither party was making any concessions or admissions regarding wrongful conduct or whether trade secrets and confidential business information were actually at issue. The parties agreed the stipulated injunction could not be used to prove Applied was the prevailing party in the litigation.

Applied filed a first amended complaint in September 2019, adding a cause of action against Jarrells for breach of fiduciary duty and asserting claims against Bruin for misappropriation and intentional interference with contractual relations.

Following trial, a jury made the following findings in its verdict form:

1. Jarrells acquired, used, or disclosed Applied's trade secrets by improper means.

2. Jarrells's improper acquisition, use, or disclosure of Applied's trade secrets was not a substantial factor in causing damage to Applied or unjustly enriching Jarrells.

3. Bruin acquired, used, or disclosed Applied's trade secrets by improper means.

6

4. Bruin's improper acquisition, use, or disclosure of Applied's trade secrets was not a substantial factor in causing damage to Applied or unjustly enriching Bruin.

5. Jarrells breached the Agreement.

6. Applied was not harmed by Jarrells's breach of contract.

7. Jarrells did not breach any fiduciary duty to Applied.

8. Bruin did not interfere with any contract between Jarrells and Applied.

The jury awarded no damages to Applied on any of its claims. In September 2021, the trial court granted Applied's posttrial motion for a permanent injunction against Jarrells and Bruin. The injunction was issued based on both the Agreement and the California Uniform Trade Secrets Act, Civil Code section 3426 et seq. (California UTSA). Applied dismissed Bruin from the action without prejudice in December 2021.

Also in December 2021, Applied filed a motion for an award of attorney fees and costs against Jarrells. Applied requested $3,348,877.95 in attorney fees and $562,222.30 in costs, for a total of $3,911,100.25. The trial court granted the motion but awarded Applied only $513,962.78 in fees and $39,942.78 in costs.[2]

The trial court entered judgment in September 2022 in favor of Applied and against Jarrells on the first cause of action for misappropriation of trade secrets and in favor of Jarrells and against Applied on the causes of action for breach of contract and breach of fiduciary duty. The court incorporated into the judgment both the permanent injunction and its prior ruling ordering Jarrells to pay attorney fees and costs.

---

[2] After the trial court ruled on Applied's motion for attorney fees, Jarrells filed his own motion for attorney fees. The court found Jarrells was a prevailing party on certain claims and awarded him attorney fees. That order is the subject of a separate appeal, case No. G062699.

7

Jarrells filed a timely notice of appeal.  Applied filed a timely notice of cross-appeal.

DISCUSSION

I.

APPLIED PREVAILED ON ITS CLAIM FOR TRADE SECRET MISAPPROPRIATION

As an initial matter, we must determine whether Applied prevailed at trial on its cause of action against Jarrells for misappropriation of trade secrets.  In a nutshell, Jarrells argues Applied could not be the prevailing party on its trade secret misappropriation claim because, although the jury found Jarrells misappropriated Applied's trade secrets, it did not find the misappropriation either caused Applied to suffer damages or resulted in Jarrells being unjustly enriched.  Jarrells argues he therefore prevailed on this claim because proof of damages or unjust enrichment is an essential element of a trade secret misappropriation claim.  We disagree.

Because Civil Code section 3426.1, subdivision (a) defines "misappropriation," our task is simply to interpret its meaning.  Here, that task begins and ends with the plain language of the statute.  (*Changsha Metro Group Co., Ltd. v. Xufeng* (2020) 57 Cal.App.5th 1, 7 [when interpreting a statute, court begins with its plain language; if plain language clearly demonstrates legislative intent, the court stops there]; *Ramirez v. City of Gardena* (2018) 5 Cal.5th 995, 1000 [the words of a statute, "'giving them their usual and ordinary meaning and construing them in context,'" provide the best and most reliable indicator of the legislative intent behind a statute].)

As defined by the plain language of the statute, misappropriation of a trade secret under the California UTSA consists of only two elements:  (1) existence of a trade secret, and (2) improper acquisition, use, or disclosure of that trade secret.  (Civ. Code, § 3426.1, subd. (b); *Hooked Media Group, Inc. v. Apple Inc.* (2020) 55 Cal.App.5th 323, 331–332; *Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 41–42; *AccuImage Diagnostics Corp. v. Terarecon, Inc.* (N.D.Cal. 2003)

8

260 F.Supp.2d 941, 950; *Corporate Express Document & Print Mgmt. v. Coons* (C.D.Cal. Apr. 21, 2000, No. CV 00-2426 AHM (Mex)) 2000 U.S.Dist. Lexis 22243, pp.*23–*24.)  By its terms, the California UTSA does not require proof of causation or damages as elements of a claim for misappropriation.  To the contrary, the California UTSA identifies damages as a *remedy* that is available once misappropriation has been established.  (Civ. Code, § 3426.3, subd. (a).)  "Section 3 of the [Uniform Trade Secrets] Act allows for the award of damages *if a case of misappropriation is established*."  (Jager & Lane, 1 Trade Secrets Law (2023) § 3:42, italics added.)

To be sure, where (as here) a trier of fact finds misappropriation has occurred under Civil Code section 3426.1, subdivision (b), the next step is to determine whether the misappropriation caused plaintiff to suffer "actual loss" or caused defendant to be unjustly enriched.  (*Id.*, § 3426.3, subd. (a).)  But a jury finding that neither damages nor unjust enrichment has been proven does not end the remedy inquiry.  The California UTSA provides that if neither actual loss nor unjust enrichment can be proven, the trial court may award a reasonable royalty as a remedy for the misappropriation.  (*Id.*, § 3426.3, subd. (b).)  The California UTSA also authorizes the court to enjoin actual or threatened misappropriation.  (*Id.*, § 3426.2, subd. (a).)

Based on the plain language of the statutory definition of "misappropriation," we conclude causation and damages are not elements of a claim for misappropriation of trade secrets under the California UTSA.[3]

---

[3] *O2 Micro Intern. Ltd. v. Monolithic Power Systems* (N.D.Cal. 2005) 399 F.Supp.2d 1064, supports our conclusion.  In that case, the trial court awarded a reasonable royalty and exemplary damages to the plaintiff under the California UTSA even though the plaintiff had failed to prove it suffered any damages and the court found as a matter of law the defendant had not been unjustly enriched.  (*Id.* at pp. 1077–1080.)  The court denied the plaintiff's request for an injunction because the trade secrets had been disclosed and there was no evidence the defendant had obtained a commercial advantage from the misappropriation, not because the elements of the misappropriation claim had not been proven.  (*Id.* at p. 1070.)

Jarrells points to standard jury instruction CACI No. 4401, and cases citing it, as support for his position that causation and damages are essential elements of a misappropriation claim under the California UTSA. Jarrells's reliance on CACI No. 4401 misses the mark.

A CACI instruction is not itself authority for a legal proposition. If an "instruction conflicts with the statute, the statute necessarily controls." (*People v. Bergen* (2008) 166 Cal.App.4th 161, 173, fn. 7.) As shown above, nothing in the California UTSA supports an interpretation that a trade secret has not been misappropriated unless the plaintiff can prove the misappropriation caused it to suffer damages or unjustly enriched the defendant. Thus, even if CACI No. 4401 identified causation and damages as necessary *elements* to prove a trade secret was misappropriated, it would not control our analysis.

In any event, fairly read, CACI No. 4401 does not instruct the jury that it cannot find misappropriation has occurred unless it finds the misappropriation resulted in damages or unjust enrichment. The instruction addresses the issues of damages and unjust enrichment because, by definition, those are the only remedies a jury could consider or award for an adjudicated misappropriation. The other remedies available to a plaintiff whose trade secrets have been misappropriated—reasonable royalty and injunction—may be awarded only by the trial court. (Civ. Code, §§ 3426.2, 3426.3, subd. (b).) Thus, CACI No. 4401 simply instructs the jury that for Applied to "succeed on [its] claim" for an award of damages or unjust enrichment, it must prove not only the two statutory elements of misappropriation but also that it suffered damages or that defendants have been unjustly enriched.

Finally, the interpretation Jarrells urges us to adopt would fly in the face of both the statute and common sense. Under Jarrells's view, a jury could find (as it did here) a defendant improperly acquired, used, or disclosed trade secrets, but if the legal remedies available to plaintiff—damages or unjust enrichment—could not be proven, the

10

trial court would be *divested* of its express statutory authority to award a reasonable royalty or enjoin continued misappropriation, leaving the defendant free to continue its misappropriation. We cannot rewrite the statute to reach that result. Moreover, under Jarrells's view, a plaintiff that acts quickly (and successfully) to stop misappropriation of its trade secrets before any commercial harm has been done would be precluded from obtaining an injunction to get its stolen trade secrets back and prevent their future unauthorized used. We decline to ascribe such an intent to the Legislature.

Jarrells also relies heavily on *Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658 (*Sargent Fletcher*), in which the trial court addressed which party in a trade secret misappropriation case bears the burden of proving the defendant used the claimed trade secrets. On the way to resolving that issue, the appellate court stated, "[u]nder the [California] UTSA, a prima facie claim for misappropriation of trade secrets requires the plaintiff to demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." (*Id.* at p. 1665.)

*Sargent Fletcher* does not support Jarrells's position. First, the language that damages are part of a prima facie claim under the California UTSA is dicta. Moreover, neither the statute nor the cases cited by *Sargent Fletcher* supports the proposition that trade secret misappropriation cannot be proven without also proving damages or unjust enrichment. As shown above, Civil Code section 3426.1 does not define misappropriation to require proof of causation and damages and/or unjust enrichment. Further, the cases *Sargent Fletcher* cites as support for its summary recitation of the elements of a claim under the California UTSA do not hold that damages are an essential element to prove trade secret misappropriation. (See *Frantz v. Johnson* (2000) 116 Nev. 455, 466; *Total Care Physicians, P.A. v. O'Hara* (Del.Super.Ct. 2001) 798 A.2d 1043, 1052–1053.)

11

Other cases cited by Jarrells for the proposition that damages are an element of a trade secret misappropriation claim, which also cite only CACI No. 4401, are not on point. (See *AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.* (2018) 28 Cal.App.5th 923, 942 (*AMN*) [considering whether a trade secret was at issue, not whether damages must be proven as an element of the claim]; *Jasmine Networks, Inc. v. Superior Court* (2009) 180 Cal.App.4th 980, 997 [current ownership of a trade secret not required to assert a claim for misappropriation]; *Masimo Corp. v. Apple, Inc.* (C.D.Cal. May 4, 2023, No. SACV 20-00048 JVS (JDEx)) 2023 U.S.Dist. Lexis 78446 at pp. *8– *9 [quoting *AMN*; on motion for judgment as a matter of law, court considered issues of intent, existence of trade secrets, and acquisition/use/disclosure, not whether claim failed for lack of proof of damages].)

In sum, the jury found Jarrells misappropriated Applied's trade secrets by acquiring, using, or disclosing them by improper means.[4] That constituted a finding by the trier of fact that misappropriation occurred, which in turn permitted the trial court to consider whether to impose an injunction or assess a reasonable royalty. The court had statutory authority to impose those remedies even though the jury found that the legal remedies submitted to it—damages or unjust enrichment—were not proven. In light of the jury's misappropriation finding and the court's imposition of an injunctive remedy, we have no difficulty concluding Applied was the prevailing party on its trade secret misappropriation claim.

## II.

### THE TRIAL COURT DID NOT ERR IN ISSUING A PERMANENT INJUNCTION

Jarrells contends the trial court erred by issuing a permanent injunction. "'A permanent injunction is merely a remedy for a proven cause of action. It may not be issued if the underlying cause of action is not established.'" (*City of South Pasadena v.*

---

[4] The jury made similar findings with respect to Bruin.

*Department of Transportation* (1994) 29 Cal.App.4th 1280, 1293.) We review an order granting a permanent injunction for abuse of discretion. (*Mendez v. Rancho Valencia Resort Partners, LLC* (2016) 3 Cal.App.5th 248, 260.)[5] To the extent the court made any factual findings, we review them for substantial evidence. (*Mendez*, at pp. 260–261.) We review any legal issues de novo. (*Id.* at p. 261.)

The trial court issued the permanent injunction pursuant to the Agreement, Code of Civil Procedure section 526, and Civil Code sections 3426.2 and 3422.[6] The injunction included the following orders:

1. Jarrells and Bruin are prohibited from possessing, using, or disclosing the information identified at trial as Applied's trade secrets.

2. Jarrells and Bruin must, at their own expense, retain a qualified and independent third party computer forensic professional to examine Jarrells's and Bruin's

---

[5] Jarrells argues the correct standard of review is de novo: "[W]here an appeal attacks the legal premises of a permanent injunction on undisputed ultimate facts . . . our review is de novo." (*People ex rel. Becerra v. Huber* (2019) 32 Cal.App.5th 524, 532.) Given that the parties are still disputing on appeal who is the prevailing party on the misappropriation and breach of contract claims, we conclude the ultimate facts in this case are not undisputed, and the abuse of discretion standard therefore applies here. Even if we were to review this issue de novo, both the language of the California UTSA and the language of the Agreement would require us to affirm the issuance of the permanent injunction, as explained below.

[6] "Except where otherwise provided by this Title, a final injunction may be granted to prevent the breach of an obligation existing in favor of the applicant: [¶] 1. Where pecuniary compensation would not afford adequate relief; [¶] 2. Where it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief; [¶] 3. Where the restraint is necessary to prevent a multiplicity of judicial proceedings; or, [¶] 4. Where the obligation arises from a trust." (Civ. Code, § 3422.) Although Civil Code section 3422 is not part of the California UTSA, it is nevertheless relevant because "'[i]njunctions in the area of trade secrets are governed by the principles applicable to injunctions in general.'" (*DVD Copy Control Assn. Inc. v. Bunner* (2004) 116 Cal.App.4th 241, 250.)

devices and electronic accounts, identify Applied's trade secrets, and ensure the misappropriation of those trade secrets has been remediated.

3. Jarrells and Bruin must submit to Applied and the court a report by the third party computer forensic professional describing the remediation protocols and their results.

4. Jarrells and Bruin must return to Applied the information identified at trial as Applied's trade secrets and permanently delete that information from their electronic systems, devices, and accounts.

Jarrells appeals the issuance of the permanent injunction based solely on his contention Applied did not prevail on the claim for misappropriation of trade secrets. Because we concluded above that Applied proved its claim for misappropriation under the California UTSA, the statute permitted the trial court to award injunctive relief to Applied. (See Civ. Code, § 3426.2, subds. (a) ["Actual or threatened misappropriation may be enjoined"] & (c) ["In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order"].)

In any event, the Agreement also authorized injunctive relief to prohibit breach of the covenants set forth in it, including Jarrells's agreement not to take or use Applied's trade secrets. It was not inappropriate for the trial court to issue a permanent injunction based on the evidence Jarrells still had Applied's trade secret and confidential documents in his possession after issuance of the preliminary injunction. Based on the jury's finding of misappropriation and our conclusion affirming that finding, we find the court did not err in issuing the permanent injunction.

THE TRIAL COURT DID NOT ERR IN FINDING APPLIED WAS ENTITLED TO AN AWARD OF ATTORNEY FEES, COSTS, AND EXPENSES AGAINST JARRELLS

The trial court granted in part and denied in part Applied's motion for an award of $3.9 million in attorney fees, costs, and expenses.[7] It found Applied was entitled to fees based on Jarrells's agreement to reimburse Applied for the reasonable attorney fees, costs, and expenses it incurred to obtain an injunction restraining Jarrells from breaching any of the covenants in the Agreement. Those covenants included Jarrells's agreement not to disclose Applied's trade secrets to others or use Applied's trade secrets to benefit anyone other than Applied. The court nevertheless awarded Applied substantially less than the full amounts it sought.[8]

Both parties appealed from the trial court's fee order. Jarrells contends no attorney fees or costs could be awarded to Applied because he was the prevailing party on all causes of action. For its part, Applied challenges most of the court's reductions in the fees, costs, and expenses requested.

"'"'An order granting or denying an award of attorney fees is generally reviewed under an abuse of discretion standard of review; however, the "determination of whether the criteria for an award of attorney fees and costs have been met is a question of law." [Citations.]'"' [Citation.] An issue of law concerning entitlement to attorney fees is reviewed de novo. [Citations.] 'When a trial court has resolved a disputed factual

---

[7] This sum did not include another $1.2 million in fees and $79,000 in costs that Applied chose to exclude from its fee motion.

[8] The trial court did not base its fee award on the California UTSA statutory provision authorizing an award of attorney fees where misappropriation has been found to be willful and malicious. (Civ. Code, § 3426.4.) As we discuss below in part VI, the court erroneously granted Jarrells's motion for nonsuit on whether the misappropriation was willful and malicious. On remand, if the misappropriation is found to be willful and malicious, the court may consider whether to award attorney fees under Civil Code section 3426.4 in addition to or instead of under the Agreement.

issue, an appellate court reviews the ruling according to the substantial evidence rule. The trial court's resolution of the factual issue must be affirmed if it is supported by substantial evidence. [Citation.] We look at the evidence in support of the trial court's finding, resolve all conflicts in favor of the respondent and indulge in all legitimate and reasonable inferences to uphold the finding.'" (*Carpenter & Zuckerman, LLP v. Cohen* (2011) 195 Cal.App.4th 373, 378.)

Because we held above that Applied prevailed on its trade secret claim against Jarrells, we conclude the trial court did not err in finding Applied was entitled to an award of the reasonable attorney fees, costs, and expenses Applied incurred to obtain the permanent injunction against Jarrells. The jury's finding that Jarrells misappropriated Applied's trade secrets supported the court's conclusion that Jarrells breached the Agreement and Applied therefore was entitled to a permanent injunction enjoining any continuing or threatened misappropriation.

The Agreement entitled Applied to recover the "reasonable attorneys fees, costs and expenses incurred in obtaining [equitable] relief." The Agreement did not require Applied to prevail on a claim for breach of contract to recover its fees, costs, and expenses. It simply required Applied to succeed in obtaining equitable relief restraining misappropriation or other breach of the covenants in the Agreement. As the trial court noted, "plaintiff did obtain injunctive relief with regard to return of its 'proprietary' information, a right granted to plaintiff in the contract itself, and upon which plaintiff is seeking its fees. But that doesn't mean plaintiff prevailed on this cause of action [for breach of contract]. It just means it may collect the fees incurred in obtaining the injunctive relief."

It has long been the law in California that, despite the general rule that all parties to litigation bear their own fees and costs, a litigant may obtain an award of its reasonable attorney fees and costs where it is a party to an agreement that provides for

16

such an award. (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751.) That is the case here.

The Agreement between Jarrells and Applied authorized Applied to obtain an injunction to prevent breach of the covenants set forth in the Agreement, including Jarrells's covenant not to use or disclose Applied's trade secrets. That is exactly what Applied did. By prevailing on its trade secret claim, Applied made it possible to obtain a permanent injunction restraining Jarrells from committing any further acts of misappropriation and compelling him to return the purloined trade secrets. Based on the plain language of the Agreement, Applied is entitled to an award of the reasonable attorney fees, costs, and expenses it incurred to secure that injunction.[9]

IV.

### THE TRIAL COURT ERRED IN SOME RESPECTS IN DETERMINING THE AMOUNT OF ATTORNEY FEES, COSTS, AND EXPENSES AWARDED TO APPLIED

We turn to the question of whether the trial court erred in determining the amount of fees, costs, and expenses it awarded.

Applied's motion for attorney fees separated the requested fees into six categories based on the tasks for which they were incurred.[10] The trial court denied all fees for two of the categories, discovery/motion practice and the fee motion itself. For two other categories—Applied's opposition to Jarrells's motion for summary judgment

---

[9] Based on this conclusion, we need not address Applied's argument it was entitled to recover attorney fees and costs as the prevailing party on the breach of contract claim.

[10] The categories, as set forth in counsel's declaration in support of the motion for attorney fees and used in the trial court's minute order were: (1) case investigation, strategy, obtaining a temporary restraining order (01/24/19 to 02/21/19), (2) case investigation and development, obtaining partial return of materials (01/22/19 to 09/12/19), (3) discovery and motion practice (07/18/19 to 10/01/20), (4) opposition to Jarrells's motion for summary judgment (02/14/20 to 09/11/20), (5) trial preparation and trial (10/01/20 to 03/23/21), (6) obtaining a permanent injunction (03/15/21 to 08/27/21), and (7) attorney fees motion (09/28/21 to the date of the hearing).

17

and its posttrial motion for entry of the permanent injunction—the court concluded the amount of time spent by the attorneys was unreasonable, and it awarded fees based on a reduced number of hours. As to all categories other than the posttrial motion for a permanent injunction, the court found Applied was entitled to only 25 percent of the fees it requested because (1) Applied could only recover the fees directly related to the injunctive relief and (2) the injunction was awarded on only one of Applied's four causes of action (i.e., 25 percent of the claims). Thus, for those five fee categories, the court imposed an across-the-board reduction of 75 percent. Finally, the court reduced the fees awarded in all categories by another 25 percent because the hourly rates charged by counsel were unreasonably high.

Applied challenges the trial court's award on four grounds: (1) the court should not have reduced the fees by 75 percent to reflect Applied's failure to prevail on three of its causes of action because all of the causes of action arose out of the same core facts and therefore were inextricably intertwined; (2) even if some apportionment were appropriate, the court should not have excluded fees, costs, and expenses associated with Applied's claims against Bruin for intentional interference with contract and against Jarrells for breach of fiduciary duty, because Applied already excluded those fees, costs, and expenses from the amounts sought in its fee motion; (3) the court should not have refused to award attorney fees for any discovery and motion practice; and (4) the court should not have excluded from the award of costs all expenses of Applied's retained litigation experts.[11]

*A. The Trial Court Erred in Its Apportionment of Fees and Costs Between Causes of Action*

The trial court determined Applied was entitled only to an award of the attorney fees it reasonably incurred in its effort to obtain the permanent injunction

---

[11] Applied did not appeal the court's 25 percent reduction of its counsel's hourly rates on the ground the rates were excessive.

restraining Jarrells from further trade secret misappropriation. In relevant part, the court's minute order reads: "Plaintiff contends it should be reimbursed for all hours spent prosecuting this case. Defendant claims the award should be limited to the hours spent in obtaining the injunctive relief. The court agrees with defendant. Plaintiff was prosecuting four causes of action. The right to attorney fees sprung from the provisions of the contract, but the jury did not find in favor of plaintiff in that cause of action. Although technically plaintiff is not the prevailing party on that claim, pursuant to the terms of the contract it is entitled to attorney fees." Based on this reasoning, the trial court reduced the requested fees by 75 percent because Applied only prevailed on 25 percent of its claims. The court applied a similar reduction to Applied's request for costs.

Jarrells argues the trial court properly reduced Applied's requested fees and costs by 75 percent, citing this portion of the minute order: "A court properly refuses a request for apportion [*sic*] attorney fees incurred in defending a contract claim and those incurred in defending non-contract claims where all causes of action rely on the same factual allegations. [Citation.] The court's determination here is to deny apportionment and permit plaintiff's attorney fees as to the time spent on obtaining the injunctive relief only. Had plaintiff not made, and the court had not granted, the [posttrial] permanent injunction, plaintiff wouldn't be entitled to any fees at all."

Our review of the trial court's minute order leads us to conclude that, despite its statement to the contrary, the court did in fact "apportion" Applied's requested attorney fees and costs in two respects: first, to award only fees and costs related to the one cause of action (misappropriation) on which Applied prevailed, and second, to award only those fees and costs Applied reasonably incurred to establish the misappropriation occurred and thereby obtain the permanent injunction.

The principle of apportioning fee awards has long been recognized. When, for example, a claim based on a contract providing for attorney fees is joined with noncontract claims, the prevailing party is only entitled to recover fees related to the

19

contract action and the court may properly apportion out the fees for the noncontract claims. (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129.) Where the attorney fees are incurred in connection with both the contract and noncontract claims, they may, but need not, be apportioned. (*Id.* at pp. 129–130.) "'"Apportionment is not required when the claims for relief are so intertwined that it would be impracticable, if not impossible, to separate the attorney's time into compensable and noncompensable units."'" (*Hjelm v. Prometheus Real Estate Group, Inc.* (2016) 3 Cal.App.5th 1155, 1178 (*Hjelm*).)

We find no error in the trial court's decision to limit (or apportion) the fee award to comply with the terms of the Agreement that created the right to the fee award, i.e., to award only the attorney fees, costs, and expenses Applied incurred to obtain the injunction.

Such apportionment here is consistent with the Agreement, which provides (1) in addition to any other remedies available to it, Applied had the right to obtain an injunction to restrain a "breach or threatened breach" of the covenants set forth in the Agreement, and (2) if such equitable relief were granted, Jarrells would be "obligated to reimburse [Applied] for the reasonable [attorney] fees, costs and expenses incurred in obtaining such relief." In other words, the Agreement that created Applied's right to an award of attorney fees, costs, and expenses specifically defined—and limited—the scope of the permissible award.

The questions then become whether the trial court erred in calculating the apportioned fees and costs, and the standard of review we apply to answer that question. "'Once a trial court determines entitlement to an award of attorney fees, apportionment of that award rests within the court's sound discretion.'" (*Hjelm, supra*, 3 Cal.App.5th at p. 1177.) Accordingly, Applied bears the burden of "'establish[ing] that discretion was clearly abused and a miscarriage of justice resulted.'" (*Ibid.*)

20

*Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310 (*Holguin*), is instructive on the weight we give to the trial court's apportionment analysis. In addition to a breach of contract claim, the Holguin plaintiffs pursued multiple tort claims, four of which were nonsuited by the court during trial. (*Id.* at p. 1331.) The jury found in favor of the plaintiffs on the two remaining tort claims and the breach of contract claim, awarding economic damages on all three claims and noneconomic damages on the tort claims. (*Ibid.*) "'Based on its substantial familiarity with the issues in the case and the evidence presented at trial,'" the trial court made findings as to the percentage of attorney time attributable to liability versus damages, and then reduced the attorney time based on tort damages versus contract damages. (*Ibid.*) The plaintiffs contended on appeal "much of the evidence offered by the [plaintiffs] in support of their noneconomic damages was 'useful' or 'necessary' to support their economic damages. Thus, they maintain, the attorney time that the trial court attributed to their noneconomic damages should be included in the fee award." (*Id.* at pp. 1331–1332.)

The appellate court in *Holguin* rejected this argument. "Assessment of these issues requires analysis of the interplay between the [plaintiffs]' various claims, the evidence offered at trial, and the reasonableness of the time spent on various aspects of the [plaintiffs]' trial presentation. These are matters that are properly committed to the trial court's sound discretion. [Citation.] The trial court found the proportion of economic to noneconomic damages to be an appropriate proxy for apportionment of attorney fees attributable to the [plaintiffs]' damages case. The [plaintiffs] have provided no reason to substitute our judgment for that of the trial court in this regard." (*Holguin, supra*, 229 Cal.App.4th at p. 1332.)

Although we undertake our review of the amount of fees awarded by the trial court with considerable deference, it is still the case that it must appear from the record that, in determining the amount of the fees, the court actually exercised and did not abuse its discretion. (*In re Marriage of Sharples* (2014) 223 Cal.App.4th 160, 165

21

[even where trial court has "'considerable latitude'" in awarding attorney fees, if its decision does not show exercise of discretion and consideration of relevant factors, it has abused its discretion]; *Garcia v. Santana* (2009) 174 Cal.App.4th 464, 476–477 [trial court's failure to exercise discretion in addressing request for prevailing party attorney fees is abuse of discretion]; *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 395–396 [same].)

It is here we part ways with the trial court's 75 percent mathematical apportionment. Except for the category of fees incurred by Applied in its posttrial motion for a permanent injunction, the court applied a flat 75 percent reduction to the fees and costs Applied requested. It appears the court selected the 75 percent figure because it concluded (1) of the four causes of action Applied asserted, it prevailed on only one; (2) the permanent injunction was only issued because of that one claim; and (3) only 25 percent of the fees and costs incurred could have related to the claim that ultimately led to the issuance of the permanent injunction.

In applying a blanket 75 percent reduction, the trial court appeared to perform a mechanical, mathematical exercise, without any analysis of the extent to which the other three claims rested, in whole or in part, on the same core of underlying facts that formed the basis for the trade secret misappropriation cause of action. That was an abuse of the court's discretion. (See *Mountjoy v. Bank of America, N.A.* (2016) 245 Cal.App.4th 266, 280–282 [reversing trial court's arbitrary across-the-board reduction in hours for purposes of fee award]; *Hadley v. Krepel* (1985) 167 Cal.App.3d 677, 686 [apportionment not appropriate between contract and noncontract claims because both types of claims were related by a single common issue].)

Although we reverse the trial court's order as it pertains to the blanket 75 percent reduction in fees and costs, we decline Applied's request that we determine the final amount of awardable fees, costs, and expenses. The trial court is in the best position to determine the extent to which the allegations supporting the four causes of

22

action overlapped, including, by way of example, the extent to which the discovery and evidence reasonably necessary for Applied to prove its misappropriation claim overlapped with the discovery and evidence reasonably necessary for the other three causes of action.  Accordingly, we remand for the court to (1) make determinations regarding apportionment of the fees, costs, and expenses Applied reasonably incurred to prevail on its trade secrets claim and obtain equitable relief, and (2) to calculate a reasonable award based on them.

In a related argument, Applied also contends that even if some reduction were appropriate to reflect fees and costs devoted to claims on which it did not prevail, the trial court could not properly apply any reduction to account for Applied's intentional interference with contract claim against Bruin or its breach of fiduciary duty claim against Jarrells because Applied already excluded from its motion the fees, costs, and expenses it believed were attributable solely to prosecuting those two claims.  Implicit in this argument is the suggestion the court was bound to accept Applied's judgment concerning what was (and was not) properly attributable to these two claims.

The declaration of Applied's counsel in support of the motion for attorney fees states, in relevant part:  "Pursuant to the terms of the Proprietary Information Agreement between Jarrells and [Applied], [Applied] is entitled to recover the fees and costs incurred to obtain injunctive relief against Jarrells, not all fees and costs incurred to prosecute this action over the course of three years. . . . To properly apportion the fees and costs that can be primarily attributed to those incurred in connection with obtaining injunctive relief against Jarrells, I, with the assistance of two other attorneys at Jones Day, . . . self-audited and reviewed Jones Day's billing records . . . line by line to isolate the fees and costs that would not be appropriate to seek in this Motion (i.e., those that were not incurred primarily to further [Applied]'s efforts to establish its misappropriation and breach of contract claims and to obtain injunctive relief against Jarrells)."  Counsel's

23

declaration specified Applied was not seeking attorney fees or costs associated with the interference claim against Bruin or the breach of fiduciary duty claim against Jarrells.

We find no error by the trial court in this regard. The fact that Applied's counsel believes it properly excluded unrecoverable fees from its fees motion does not mean the court is obligated to agree. Whether to accept counsel's judgments and calculations was a matter within the court's discretion. "We may not reweigh on appeal a trial court's assessment of an attorney's declaration." (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1323.)

## B. The Trial Court Erred by Denying All Fees and Costs Incurred for Discovery and Motion Practice

The trial court denied all attorney fees Applied incurred for discovery and motion practice, explaining: "The law and motion practice and discovery did nothing to support the injunctive relief. The preliminary injunction was in place. As the jury found defendant was not enriched and plaintiff was not 'damaged' by the alleged misappropriation of trade secrets, the hours claimed were not expended in support of the permanent injunction. Plaintiff was only granted the permanent injunction because after the jury found 'no damages,' plaintiff convinced the court that the term 'harm' was different and only argued generically, that permanent injunctive relief was appropriate."

On appeal, Applied contends the trial court's conclusion was legally and factually incorrect. Applied notes that all told, to both uncover the facts necessary to prove its own claims and to respond to Jarrells's own "extensive" discovery, Applied's attorneys participated in nine nonexpert depositions, exchanged over 39 sets of written discovery, filed or responded to five discovery-related motions or briefs, and produced and evaluated more than 200,000 pages of documents, among other things. In response, Jarrells contends fees devoted to discovery were unnecessary because the relief granted by the permanent injunction "is almost precisely the relief Jarrells stipulated to at the outset of the case" in the preliminary injunction.

24

We agree with Applied. A preliminary injunction is not the same as a permanent injunction. A permanent injunction is "a determination on the merits" that requires the party seeking the injunction to present evidence proving the elements of the plaintiff's cause of action. (*Art Movers, Inc. v. Ni West, Inc.* (1992) 3 Cal.App.4th 640, 646.) A party generally obtains such evidence through discovery and, where necessary, motion practice. Moreover, by their terms, the preliminary injunction and the permanent injunction entered here were not identical. Thus, to obtain the permanent injunction, it was incumbent on Applied to develop and present sufficient evidence at trial to support its claims.

It is true, of course, that "'[t]he "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong."'" (*Laffitte v. Robert Half Internat. Inc.* (2016) 1 Cal.5th 480, 488.) But Jarrells did not stipulate to having misappropriated Applied's trade secrets or to entry of a permanent injunction; he denied Applied's allegations and litigated the case through trial. The existence of a *preliminary* injunction certainly did not obviate the need for Applied to prepare for trial and to conduct whatever discovery was reasonably necessary to prove its claim for trade secret misappropriation and thereby obtain injunctive relief. We conclude, therefore, that the trial court's blanket denial of all fees and costs for discovery and motion practice on the ground that the preliminary injunction was already in place, without evaluating and determining the extent to which the discovery and motion practice was reasonably incurred by Applied to prove its claims and thereby obtain the permanent injunction, was an abuse of discretion.

On remand, the trial court shall evaluate the discovery and the motions for which Applied seeks attorney fees and costs to determine whether they were reasonably incurred by Applied to prove trade secret misappropriation and thereby enable it to seek and obtain the permanent injunction.

25

*C. The Trial Court Did Not Err by Refusing to Award Expert Witness Fees Incurred by Applied.*

Finally, Applied asserts the trial court erred by denying Applied's posttrial request—included as part of its motion for an award of attorney fees and costs—for an award of nearly $400,000 in expert witness fees it incurred.[12] Citing this court's opinion in *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal.App.4th 1050, 1066 (*Thrifty Payless*), Applied concedes that "[u]nder a contractual fee provision, expert expenses are not necessarily recoverable where the agreement merely mentions 'fees' and 'costs.'" But Applied points to the provision in the Agreement by which Jarrells agreed that if injunctive relief were entered to restrain any actual or threatened breach of his contractual obligations, he "shall be obligated to reimburse the company for the reasonable attorneys fees*, costs and expenses* incurred in obtaining such relief." (Italics added.) From this, Applied argues the plain language of the Agreement reveals an intent to authorize more than just standard recoverable costs under Code of Civil Procedure section 1033.5. Applied notes that "expert fees are plainly a type of 'expense.'"

We agree that, where parties enter into an agreement for an award of "fees and costs" without defining "costs," the term is interpreted to embrace only awardable costs under Code of Civil Procedure section 1033.5. (*Ripley v. Pappadopoulos* (1994) 23 Cal.App.4th 1616, 1619 [expert witness expenses were not recoverable costs where parties' written agreement authorized prevailing party on contract action to recover "attorney fees and costs"]; see *Benson v. Kwikset Corp.* (2007) 152 Cal.App.4th 1254, 1279–1280.) We also agree parties to a contract may "knowingly and intentionally" negotiate to recover more than is statutorily authorized by Code of Civil Procedure

---

[12] The trial court's order did not explain why it declined to make such an award.

26

section 1033.5's list of recoverable costs. (*Thrifty Payless, supra*, 185 Cal.App.4th at pp. 1066–1067.)[13]

The questions, then, are (1) whether the term "expenses," as used in the parties' Agreement, includes out-of-pocket expenses incurred for expert witness fees and, if so, (2) whether Applied properly sought such expenses under the Agreement as part of its posttrial motion for attorney fees and costs, instead of pleading and proving them at trial.

We begin with the meaning of the term "expenses" in the Agreement. Unless the meaning of contract language turns on the credibility of extrinsic evidence (which is not the case here), interpretation of a contract is question of law. (*Thrifty Payless, supra*, 185 Cal.App.4th at p. 1060.) "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (Civ. Code, § 1638.) "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (*Id.*, § 1641.) "'We must give significance to every word of a contract, when possible, and avoid an interpretation that renders a word surplusage.'" (*SantaFe Braun, Inc. v. Insurance Co. of North America* (2020) 52 Cal.App.5th 19, 24.)

The Agreement provides for recovery of both costs *and* expenses. As noted above, where a contract provides for payment of attorney fees and costs, it is well settled

---

[13] The other case relied on by Applied, *Bussey v. Affleck* (1990) 225 Cal.App.3d 1162, is distinguishable. There, the appellate court held expert fees might be awarded under a contract providing for an award of "'all costs and expenses of collection including reasonable attorneys' fees.'" (*Id.* at p. 1164.) Such an award was permissible because expert fees may be awarded under Code of Civil Procedure section 1033.5, subdivision (b)(1) if the expert was ordered by the court; in that case, "[a]lthough the trial judge did not expressly order the parties to present expert testimony, he openly 'invited' such testimony and suggested on at least five separate occasions prior to trial that such testimony would be helpful in connection with calculations under the note." (*Bussey, supra*, at p. 1167.)

the term "costs" is limited to recoverable costs under section 1033.5 of the Code of Civil Procedure. Jarrells argues we should interpret the broader phrase "costs and expenses" in the same way. This interpretation would render the term "expenses" redundant, and the law tells us we must avoid interpretations rendering a word surplusage. Because the ordinary meaning of "expense" is "something that is expended in order to secure a benefit or bring about a result" (Webster's 3d New Internat. Dict. (1986) p. 800), we conclude that, as used in the parties' Agreement, the term "expenses" means out-of-pocket expenditures that do not come within the definition of statutory awardable costs in section 1033.5. Thus, under the plain language of the parties' Agreement, Applied is entitled to recover not just the attorney fees and statutory costs it incurred to obtain the injunctive relief, but also the other out-of-pocket expenses it incurred to obtain that relief.

Jarrells correctly points out that in *Thrifty Payless*, the parties' contract specifically defined reasonable expenses to include attorney fees, "'court costs'" and "'witness and expert fees.'" (*Thrifty Payless, supra*, 185 Cal.App.4th at p. 1065.) Jarrells therefore asks us to find that parties who wish to contractually authorize an award of expert fees must do so explicitly. But nothing in *Thrifty Payless*—or in any other case cited to us by either party—holds that to authorize recovery of out-of-pocket expenses beyond recoverable statutory costs, contracting parties must specify precisely what expenses they are referring to. We see no basis to require parties who wish to agree to authorize recovery of expenses beyond statutory costs to specifically enumerate every category of additional "expenses" they intend their contract to embrace. The plain terms of the Agreement here indicate the parties intended to authorize an award not limited to statutorily recoverable costs, and their use of the unqualified and unambiguous term "expenses" cannot be fairly interpreted to mean "some expenses" or "some expenses but not expenses incurred for retained experts." We therefore hold expert fees were recoverable by Applied pursuant to the Agreement to the extent they were reasonable in amount and reasonably incurred to obtain equitable relief.

28

We now turn to whether Applied could recover its expert witness fees as part of its postjudgment motion for attorney fees and costs. Resolution of this issue is necessary because Applied neither pleaded nor proved at trial the expert expenses it seeks.

The cases are split as to whether expenses recoverable under a contract provision, rather than as costs under Code of Civil Procedure section 1033.5, must be pleaded and proved or may be claimed through a posttrial motion for attorney fees. (*Cook v. Cook (In re Cook)* (Bankr. C.D.Cal., Dec. 20, 2019, No. 2:15-bk-10768-RK) 2019 Bankr. Lexis 3866, *13, quoting Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2019) ¶ 17:926.) The majority of cases take the former view, holding such expenses must be pleaded and proved. "[W]hile the parties may agree to allow recovery of expert witness fees by the prevailing party, this is a matter that must be pleaded and proven at trial rather than submitted in a cost bill." (*Carwash of America-PO v. Windswept Ventures No. 1* (2002) 97 Cal.App.4th 540, 544; see *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 491–492, italics added [recoverable costs not limited to those set out in Code Civ. Proc. § 1033.5 because the contracts at issue "authorize[d] recovery of all 'costs, charges and expenses' *and litigation expenses were pleaded and proven* pursuant to a procedure stipulated by the parties"].)

"Special contract damages are subject to pleading and proof in the main action and cannot be recovered by mere inclusion in a memorandum of costs. [Citations.] As an exception to this rule, the Legislature has chosen to provide for the recovery of contractual attorney fees in a cost award. [Citations.] But the Legislature has declined to adopt that procedure for the recovery of expert witness fees. [Citation.] Accordingly, assuming expert witness fees may be recovered under a contractual provision, they must be specially pleaded and proven at trial rather than included in a memorandum of costs. Since plaintiffs did not specially plead and prove their right to recover expert witness fees

29

under an appropriate provision of their contract, they were not entitled to such fees and it was error to include such fees in the cost award." (*Ripley v. Pappadopoulos, supra*, 23 Cal.App.4th at p. 1627, fn. omitted; see *First Nationwide Bank v. Mountain Cascade, Inc.* (2000) 77 Cal.App.4th 871, 879 [expert fees should have been denied where prevailing parties did not claim such fees as "'necessary expenses'" under the contract at issue until after judgment rendered].)

The other view is represented by *Thrifty Payless*, which held it is "unnecessary to specially plead and prove expert witness fees, at least in a case where expert fees are explicitly included in the contract as recoverable costs." (*Thrifty Payless, supra*, 185 Cal.App.4th at p. 1067.) The present case differs in two significant ways from *Thrifty Payless*, which we believe are dispositive. First, the contract at issue in *Thrifty Payless* specified, "the prevailing party is entitled to 'reasonable expenses,' including attorney fees, 'court costs, witness *and expert fees*.'" (*Id.* at p. 1056, italics added.) As *Thrifty Payless* explained, "if the point of specially pleading expert witness costs is to put the other party on notice that such costs may be sought, then including a specific provision in the contract is sufficient to provide notice." (*Id*. at p. 1067, fn. 10.) Here, the parties' Agreement allows Applied to recover "expenses" but does not specify expert witness fees. Second, *Thrifty Payless* was resolved via a nonsuit motion during trial, so it would not have been possible for the prevailing party to prove its expert fees. (*Id.* at p. 1054.) As that court explained: "[I]t seems counterproductive, if not slightly absurd, to keep a jury empanelled after nonsuit has been granted for the sole purpose of determining the reasonable value of expert witnesses it never heard testify at trial." (*Id*. at 1067.)

We hold that, if expert witness fees are recoverable under a contractual term providing for recovery of "expenses," those fees must be pleaded and proven, and they are not recoverable as costs under Code of Civil Procedure sections 1032 and 1033.5. Because Applied neither pleaded its entitlement to expenses (including expert

fees) in its complaint nor proved the amount of such expenses at trial, the trial court did not err by refusing to award them as part of the postjudgment award.

V.

## THE TRIAL COURT ERRED BY EXCLUDING FROM APPLIED'S DAMAGES CALCULATION THE FEES INCURRED BY APPLIED'S FORENSIC COMPUTER EXPERT TO STOP OR MITIGATE THE MISAPPROPRIATION

At trial, Jarrells objected to Applied's damages expert including $80,000 in fees paid by Applied to its forensic computer expert in the calculation of Applied's damages. The trial court determined, "expert fees traditionally and typically are not an item of damage that is recoverable in litigation, but rather, it's a cost of the litigation, which may or may not be recoverable at the end of the case by the prevailing party." The court therefore sustained Jarrells's objection and ordered the damages expert not to include the costs of the investigation in his damages calculation. At oral argument, counsel for Applied acknowledged the court's order did not prevent any witness from testifying as to what work was performed by Applied's employees or outside experts.

"'A trial court's decision about the admissibility of evidence is ordinarily reviewed under the abuse of discretion standard.'" (*Segal v. Fishbein* (2023) 89 Cal.App.5th 692, 708, fn. 14.)

No California case addresses whether "actual loss caused by misappropriation" (Civ. Code, § 3426.3, subd. (a)) includes the cost of investigating trade secret misappropriation. The California UTSA allows the trial court to award as recoverable costs "a reasonable sum to cover the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the prevailing party." (Civ. Code, § 3426.4.) But those costs may be awarded only if there is a finding that "a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or *willful and malicious misappropriation*

31

*exists*." (*Ibid.*, italics added.)  The fact that Civil Code section 3426.4 permits an award of costs to include fees paid to retained experts to prepare for or testify at trial after a "willful and malicious" finding is strong indication the Legislature did not intend such fees to be awarded as "actual loss[es]" caused by misappropriation under section 3426.3, subdivision (a).

Cases from other states interpreting their version of the Uniform Trade Secrets Act (Uniform Act) are split on whether expert fees are awardable as "actual loss" damages.[14]  A number of courts in other jurisdictions, applying the Uniform Act, have drawn a distinction between expenses incurred to investigate a possible misappropriation and expenses incurred to stop or mitigate the misappropriation, and have held only the latter are recoverable damages.[15]  For example, in *News America Marketing v. Marquis*

[14]  "The [California UTSA] is derived from the national [Uniform Act].  [Citation.]  Case law from other jurisdictions interpreting uniform statutory provisions can be helpful in construing similar sections of the [California UTSA].  [Citations.]  Accordingly, where California law is silent, we shall refer to cases from other jurisdictions to the extent they construe or explain provisions of the Uniform Act that are similar to the corresponding sections of the [California UTSA]." (*Ajaxo, Inc. v. E\*Trade Financial Corp.* (2010) 187 Cal.App.4th 1295, 1305, fn. 6.)

[15]  Applied sometimes refers to "mitigation" and "remediation" interchangeably.  But its own forensic computer expert, Mike Bandemer of Berkeley Research Group (BRG), described "[r]emediation [as] the process of identifying trade secrets within a company and within their digital systems, whether those be computers, e-mails, networks, and then isolating that data so that it can no longer be used within the company and employees no longer have access to it.  Properly preserving it and then deleting so that it's no longer available within the system."  In other words, he made clear that "remediation" relates to efforts undertaken by a company that has improperly *received* trade secrets belonging to another to identify and isolate those trade secrets so they can no longer be accessed or used by its employees.  Significantly, Bandemer did not testify BRG performed any remediation work for Applied.  (Indeed, since Applied was the entity whose trade secrets were taken, not the company that improperly received them, there would be no occasion for Applied to ask BRG to do so.)  We have therefore used the term mitigation (not remediation) to describe the efforts undertaken by Applied's forensic computer expert to determine where and how the stolen trade secrets were disseminated and how to retrieve them so as to stop or mitigate the misappropriation.

(86 Conn. App. 2004) 862 A.2d 837 (*News America Marketing*), applying Connecticut's version of the Uniform Act, the court held expenses "incurred by the plaintiff while attempting to *mitigate and reverse* the harm actually caused by the defendant's conduct" would be recoverable as damages, but "'out-of-pocket expenses' suffered by the plaintiff [that] amount to nothing more than costs incurred in the course of investigating whether the plaintiff had suffered an injury as a result of [the defendant's] misconduct" would not be. (*Id.* at p. 846, original italics omitted, italics added.)

In *Tank Connection, LLC v. Haight* (D.Kan. 2016) 161 F.Supp.3d 957 (*Tank Connection*), the district court concluded payments by the plaintiff to an outside computer forensic company "to examine the laptop used by [the defendant] during his employment with [the plaintiff] to see if it contained 'evidence of data harvesting'" and to a forensic expert agreed on by the parties to examine the defendant's flash drives were not damages caused by misappropriation under the Kansas version of the Uniform Act. (*Id.* at p. 960 & fn. 2.) "These were investigative expenses incurred by [the plaintiff] based on its suspicions that [the defendant] might have taken data. [The plaintiff] does not deny that it undertook the forensic investigation to ascertain if there had been any theft of its proprietary information and, if so, to demonstrate a basis for legal action against [the defendant]. The court notes that plaintiff would have incurred the expenses regardless of the outcome of the examination—i.e., regardless of whether any misappropriation had occurred. Such expenses are not within the traditional realm of tort damages. As in *News* [*America Marketing*], permitting the plaintiff to claim the cost of its own investigation as compensable damages would effectively eliminate the statutory requirement of 'actual loss' for an actionable misappropriation. This was an attempt to find proof of data misappropriation, not a loss resulting from the misappropriation. The *21st Century* [*Sys. v. Perot Sys. Govt. Svcs.* (Va. 2012) 726 S.E.2d 236] case is distinguishable both because the expenses in that case were not objected to and because they were incurred as part of a remedial effort to staunch what was known to be ongoing

33

misappropriation of company data." (*Id.* at p. 966.) The court granted summary judgment in favor of the defendant on the ground the plaintiff failed to prove damages.

Other jurisdictions have held that any expenses incurred to investigate potential misappropriation are recoverable as "actual loss" damages. For example, in *Food Servs. of Am., Inc. v. Carrington* (D.Ariz., Aug. 23, 2013, No. CV-12-00175-PHX-GMS) 2013 U.S.Dist. Lexis 120194, the defendants moved for summary judgment on the claim under Arizona's version of the Uniform Act arguing, in part, the plaintiff could not prove damages because there was no evidence the defendants used the plaintiff's trade secrets or disclosed them to others. (*Id.* at pp. *43–*44.) The district court concluded the expenditure of company resources to investigate the alleged misappropriation constituted damages. "[The plaintiff] has provided some evidence that it incurred expenses to investigate Defendants' misappropriation. Such expenses incurred as a direct result of Defendants' conduct are damages for the purpose of proving [the plaintiff]'s claim under the [Arizona Uniform Act]." (*Id.* at p. *45.) It is unclear from the opinion whether some or all of these expenses were for remediation purposes. "A plaintiff is generally entitled to recover 'any proven pecuniary loss attributable to the appropriation of the trade secret' including 'the costs of remedial effort.' [Citation.] The Arizona Supreme Court has stated that when the wrongful act of a defendant 'makes it necessary to incur expense to protect [the plaintiff's] interest, such costs and expenses, . . . should be treated as the legal consequences of the original wrongful act and may be recovered as damages.'" (*Id.* at p. *44, quoting *United States Fidelity & Guaranty Co. v. Frohmiller* (Ariz. 1951) 227 P.2d 1007, 1009.)

In *SJ Medconnect, Inc. v. Boice* (M.D.Fla., June 17, 2022, No. 3:20-CV-903-MMH-JBT) 2022 U.S.Dist. Lexis 108429, the magistrate judge recommended entry of default judgment against the defendant on multiple claims, including the federal Defend Trade Secrets Act (18 U.S.C. § 1836) and the Florida Uniform Act. (*SJ Medconnect, Inc. v. Boice, supra*, at pp. *5–*6.) The magistrate judge recommended

34

the plaintiff be awarded, as damages, the money paid "to five internal employees and one external consultant to *investigate and remediate* Defendant's misappropriation of Plaintiff's trade secrets, which appears to have been largely successful in preventing greater harm." (*Id.* at p. *13, italics added.)[16] The district court adopted the magistrate judge's report and recommendations. (*SJ Medconnect, Inc. v. Boice* (M.D.Fla., July 28, 2022) 2022 U.S.Dist. Lexis 134529.)

In *21st Century Sys. v. Perot Sys. Govt. Svcs., supra*, 726 S.E.2d, several of the plaintiff's executives simultaneously left the company. The plaintiff immediately hired an outside firm to conduct a computer forensics investigation to help the plaintiff "'figure out what exactly [was] going on.'" (*Id.* at p. 246.) The forensics firm charged the plaintiff $371,002 for an analysis showing the defendants copied hundreds of files from the plaintiff's computers to external hard drives and those files were later copied to the defendants' computers at their new employer. (*Id.* at p. 244.) The costs of the forensic analysis were included in the plaintiff's damages award on a claim of misappropriation under the Virginia version of the Uniform Act (among other claims). The Virginia Supreme Court affirmed. "[W]e hold that the evidence at trial was sufficient to demonstrate that the Defendants' actions caused [the plaintiff] to initiate the computer forensics investigation and that the trial court did not err when it refused to set aside the jury's award of $371,002 in computer forensics damages in favor of [the plaintiff]." (*Id.* at p. 245.)

And in *Solvay Specialty Polymers USA, LLC v. Liu* (N.D.Ga., Nov. 22, 2019, Case No. 1:18-cv-02120-ELR) the court awarded, as actual damages under the Georgia version of the Uniform Act, "the costs [the plaintiff] incurred in engaging the

---

[16] The damages were awarded under the Defend Trade Secrets Act; the magistrate's recommendation notes: "The undersigned recommends that the Court need not undertake redundant analysis for the same relief that is independently available under multiple counts." (*SJ Medconnect, Inc. v. Boice, supra*, at p. *13, fn. 6.)

services of outside forensic experts to assess the extent of [the defendant]'s unauthorized activity and potential damage to its system."

We agree with the analysis of *News America Marketing* and *Tank Connection* and hold a plaintiff may recover, as damages on a claim of misappropriation under the California UTSA, the costs of stopping or mitigating the misappropriation, but not the costs of investigating to determine whether and how any misappropriation occurred.

Applied contends the expenses claimed here were incurred as part of an effort to "'staunch'" the ongoing misappropriation of Applied's data, citing *Tank Connection, supra*, 161 F.Supp.3d at page 966. At oral argument, counsel for Applied agreed that expenses incurred solely to determine whether there had been a loss of trade secrets would not be recoverable, while expenses incurred to determine where those trade secrets went and how to get them back would be mitigation expenses and would be recoverable. We have reviewed the evidence presented at trial and conclude it does not support Applied's argument that all of the expert witness fees at issue were incurred as part of an effort to stop or mitigate the damage from Jarrells's misappropriation.

Mike Bandemer, of forensic consulting company BRG, testified BRG was retained to perform a forensic examination, assist with an investigation, and testify in the litigation. He explained: "I was contacted by counsel indicating that Applied Medical had had concerns regarding a—large downloads of files from their system. And asked if I could participate in assisting with an investigation into those downloads and other potential breaches of their system to assess the damage and harm and to determine what, if anything, was happening with Applied's intellectual property, trade secrets."

Bandemer identified two phases of BRG's investigative work for Applied. The first phase involved determining whether trade secrets had been taken from Applied, and identifying those trade secrets (Phase 1). The second phase involved determining

36

how and where those trade secrets had been transferred in order for Applied to recover them (Phase 2).

In Phase 1, BRG examined Jarrells's Applied laptop and the data loss prevention log to see what Jarrells had downloaded into the "Good Stuff" folder and then onto a thumb drive. As Bandemer testified, "at the time all the company knew was that there was a download, they weren't sure whether . . . and to what extent there was a breach of their system. And that's why they sought out assistance as to . . . how to further investigate that, how to preserve the evidence and examine it to determine exactly what happened." BRG first prepared a forensic image of the hard drive from Jarrells's laptop issued by Applied. It also reviewed a data loss prevention log from Applied's system, which tracked the movement of data between the company's network, Jarrells's laptop, and external sources such as thumb drives. BRG then compared the data prevention log against the forensic image from the laptop. BRG concluded in this part of its investigation that from the time Jarrells accepted an offer from Bruin to the time he resigned from Applied, he copied thousands of files from his own laptop and from the Applied network drive into a file on his laptop titled "Good Stuff," and then copied all those files onto a thumb drive. BRG concluded that, on Jarrells's last day of work at Applied, he deleted the "Good Stuff" folder and emptied the recycle bin on his laptop.

BRG recovered the documents that had been deleted from Jarrells's computer and a memory stick. Gary Johnson, an employee of Applied, then reviewed the recovered documents, initially to determine "the nature of the documents that were taken." After identifying whether the documents taken belonged to Applied or to Jarrells, Johnson reviewed all of the Applied documents to categorize them as trade secret, confidential, or something else. The purpose of categorizing the documents taken by Jarrells was "to identify . . . which components of documents fit where and understand sort of the magnitude, what was taken in each one of these categories so we can get it stopped and get ahold of them and get them back." BRG created a file structure system

37

Johnson used to identify each document, categorize it, and make summary comments about it.

In Phase 2, BRG examined the thumb drives and Jarrells's Bruin laptop to see where the "Good Stuff" files ended up. Phase 2 of the investigation showed "a purposeful transfer of . . . those files from the staged data on the Applied laptop to the Kingston thumb drive, and then ultimately, to the Bruin laptop and other devices."

After the preliminary injunction was issued in this case, BRG examined the laptop issued to Jarrells by Bruin, as well as a Kingston thumb drive and a PNY thumb drive. BRG concluded Jarrells had transferred the files from his computer at Applied onto the Kingston thumb drive, and then from that thumb drive onto his Bruin laptop.

BRG prepared a report matching the files saved to the "Good Stuff" folder to items Johnson had identified as Applied's trade secrets. BRG also identified files Jarrells deleted from his Bruin laptop after being served with Applied's complaint and a notice to preserve evidence.

Bandemer testified the $80,000 bill from BRG to Jones Day was for the two phases of the investigation work. But neither Bandemer nor any other witness testified as to how much of the $80,000 was spent on the initial identification of whether and what trade secrets Jarrells had taken from Applied (Phase 1) versus how much was spent to identify what trade secrets had been transferred to Bruin (and how) so as to enable Applied to take steps to get them back (Phase 2).

We conclude Applied was entitled to seek damages for Phase 2 of the investigative work by BRG to stop or mitigate the misappropriation (or continued misappropriation) of Applied's trade secrets. The trial court erred in refusing to allow Applied's damages expert to include the cost to Applied of BRG's Phase 2 investigation services in his trial testimony calculating the "actual losses" caused by the misappropriation. We remand for this limited purpose.

## VI.

### THE TRIAL COURT ERRED BY GRANTING NONSUIT ON WHETHER JARRELLS'S CONDUCT WAS WILLFUL AND MALICIOUS

At the close of Applied's case-in-chief, Bruin moved for nonsuit on the issue of exemplary damages on the ground there was no evidence of willful or malicious misappropriation. Applied opposed the motion, arguing the evidence that Jarrells knew of his obligation not to take Applied's trade secrets but intentionally did so anyway in conscious disregard of Applied's rights and his own duties was sufficient to allow the "willful and malicious" issue to go to the jury. The trial court granted the nonsuit as to both Bruin and Jarrells.[17]

"We review the grant of nonsuit de novo." (*Holistic Supplements, LLC v. Stark* (2021) 61 Cal.App.5th 530, 541.) "A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor."' [Citation.] A mere 'scintilla of evidence' does not create a conflict for the jury's resolution; 'there must be substantial evidence to create the necessary conflict.'" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291, italics omitted.) Where the plaintiff has the burden of proving a matter by clear and convincing evidence, both the

---

[17] In granting the motion, the trial court stated: "I appreciate [Applied's] position . . . but I do not see it that way. I think that if it were as you say, then every time someone intentionally takes a trade secret, it would automatically result in punitive damages. And that is not the law. There has to be something more. There has to be an element of ill will or maliciousness, and I don't think it exists in this case."

trial court and this reviewing court must view the evidence with that higher burden in mind. (*Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 59; see *Barton v. Alexander Hamilton Life Ins. Co. of America* (2003) 110 Cal.App.4th 1640, 1644.)

The California UTSA authorizes an award of exemplary damages for willful and malicious misappropriation. (Civ. Code, § 3426.3, subd. (c).)[18] It also allows the trial court to award attorney fees to a plaintiff if the defendant's misappropriation of trade secrets was willful and malicious. (Civ. Code, § 3426.4.) Neither the Uniform Act nor the California UTSA defines "willful and malicious." In *Ajaxo Inc. v. E*Trade Group Inc.* (2005) 135 Cal.App.4th 21 (*Ajaxo*), the appellate court considered the meaning of "willful and malicious misappropriation." (*Id.* at p. 26.) The court approved the use of jury instructions using the definition of malice from Civil Code section 3294, subdivision (c)(1) ("'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others"), and the definition of willful from Penal Code section 7, subdivision 1 ("The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage").[19]

---

[18] "If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subdivision (a) or (b)." (Civ. Code, § 3426.3, subd. (c).)

[19] Insurance Code section 533 provides an alternate definition of willfulness: "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others." In this statute, willfulness "means 'something more than the mere intentional doing of an act constituting [ordinary] negligence.'" (*Fire Ins. Exchange v. Abbott* (1988) 204 Cal.App.3d 1012, 1019.) Rather, to be willful under Insurance Code section 533, an act must be "done with a 'preconceived design to inflict injury.'" (*Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 887, overruled on other grounds, *Ryan v. Rosenfeld* (2017) 3 Cal.5th 124.)

Unlike Civil Code section 3294, which authorizes punitive damages on clear and convincing evidence of oppression, fraud, or malice in the disjunctive, Civil Code section 3426.3, subdivision (c) authorizes exemplary damages on evidence of willful *and* malicious misappropriation in the conjunctive. Thus, applying the definitions approved by the *Ajaxo* court, to obtain exemplary damages a plaintiff must prove by clear and convincing evidence that the defendant's acquisition, use, or disclosure of the plaintiff's trade secret was accomplished by an act implying a purpose or willingness to commit the act *and* by conduct intended to cause injury or conduct that is despicable and carried on with a willful and conscious disregard of the rights or safety of others.

Here, the trial court focused on intent to harm and despicable conduct, agreeing Applied could make the necessary showing of willfulness. On appeal, Applied does not attempt to argue it offered sufficient evidence of Jarrells's intent to cause it harm: "Regardless whether Jarrells intended to harm Applied, there is substantial evidence that his conduct was both despicable and in conscious disregard of Applied's rights." Accordingly, the issue for us here is whether there was sufficient evidence of despicable conduct carried on with a willful and conscious disregard of Applied's rights to send the issue to the jury. We conclude there was.

"'Despicable conduct' is conduct that is "'so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people."' [Citation.] Such conduct has been described as having the character of outrage frequently associated with crime. [Citation.] 'Conscious disregard' means "'that the defendant was aware of the probable dangerous consequences of his conduct, and that he willfully and deliberately failed to avoid those consequences."' [Citation.] Put another way, the defendant must 'have *actual knowledge* of the risk of harm it is creating and, in the face of that knowledge, fail to take steps it knows will reduce or eliminate the risk of harm.'" (*Butte Fire Cases* (2018) 24 Cal.App.5th 1150, 1159.)

41

Jarrells admitted he knew downloading and taking Applied's documents violated the Agreement. Jarrells took steps to conceal his acts of misappropriation by erasing the contents of his Applied computer to prevent Applied from learning what he had done. (See *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.* (7th Cir. 2003) 342 F.3d 714, 730 [attempt to conceal misappropriation is evidence from which jury could determine exemplary damages justified]; *Advanced Fluid Systems, Inc. v. Huber* (M.D.Pa. 2018) 295 F.Supp.3d 467, 493 [efforts to cover up misappropriation, as well as duration of misappropriation and consciousness of injury can be considered in determining exemplary damages].)

The evidence tends to show Jarrells targeted and purposefully misappropriated Applied's business plans, research and development documents, sales strategies, training in formation, and customer pricing information. (See *Ajaxo, supra*, 135 Cal.App.4th at p. 67 [jury could conclude a "prolonged course of thievery" was despicable conduct]; see also *HTS, Inc. v. Boley* (D.Ariz. 2013) 954 F.Supp.2d 927, 960 [exemplary damages appropriate where the defendant's misappropriation of trade secrets was "part of purposeful plan to build a competing business"].)

Applied also points to evidence that Jarrells refused to return Applied's trade secrets even after the preliminary injunction was in place. Applied served Jarrells with the complaint and notice to preserve on February 10, 2019. On the same day, Jarrells began deleting Applied files from the laptop issued to him by Bruin. The trial court signed the stipulated preliminary injunction on February 13, 2019, prohibiting Jarrells or anyone acting in concert with him from "destroying, manipulating, or otherwise altering any evidence" relating to the allegations in Applied's complaint. In other words, the preliminary injunction effectively ordered Jarrells not to do anything with the documents he had taken. Nevertheless, BRG testified Jarrells either deleted Applied files from his Bruin desktop computer or moved them onto a thumb drive on February 13, 2019; Applied contends this occurred after the stipulated injunction was in

42

place.  (See *Mattern & Associates, L.L.C. v. Seidel* (D.Del. 2010) 678 F.Supp.2d 256, 271 [intentional removal of trade secrets and refusal to respond to demands to return confidential information justified exemplary damages].)

Based on all this, a reasonable jury could have concluded Jarrells's misappropriation was willful and malicious.  The trial court therefore erred by granting a nonsuit on this issue.

Our conclusion is supported by caselaw from other states interpreting the Uniform Act.  The United States Supreme Court has held the phrase "willful and malicious injury" in section 523(a)(6) of title 11 of the United States Code means "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." (*Kawaauhau v. Geiger* (1998) 523 U.S. 57, 61.)[20]  Relying on *Kawaauhau v. Geiger*, the Fourth Circuit Court of Appeals held willful and malicious under the Alaska Uniform Act requires more than intentional and purposeful misappropriation.  "[E]ven if [the plaintiff] is correct that the Alaska court decided [the defendant] intentionally and purposefully misappropriated [the plaintiff]'s trade secrets, that is still not enough.  It must have taken the additional step of finding that [the defendant], in so doing, intended for [the plaintiff] to be injured by that misappropriation."  (*In re Muhs* (4th Cir. 2019) 923 F.3d 377, 388; see *Mattern & Associates, L.L.C. v. Seidel, supra*, 678 F.Supp.2d at p. 271, italics added [analyzing award of exemplary damages under the Delaware Uniform Act using the state's general law regarding punitive damages; "Delaware courts have defined willfulness as 'an awareness, *either actual or constructive*, of one's conduct and a realization of its probable consequences,' and malice as '*ill-will, hatred* or intent to cause injury'"].)

---

[20]  11 United States Code section 523(a)(6) excludes from a bankruptcy discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity."

Jarrells argues any error in granting the nonsuit was necessarily harmless. He reasons that, because the jury did not award any damages to Applied, no punitive damages could be awarded. Jarrells is not wrong about that. The California UTSA authorizes exemplary damages in an amount not exceeding two times the amount of damages, unjust enrichment, or reasonable royalties. (Civ. Code, § 3426.3, subd. (c).) Because the jury found no damages or unjust enrichment and the trial court did not award reasonable royalties, we agree the court could not award exemplary damages. But this could change on remand, in light of our finding that Applied may seek some portion of BRG's investigative expenses as damages.

Moreover, Jarrells's argument fails to address the other consequence of a "willful and malicious" finding by the jury: A finding that trade secret misappropriation was willful and malicious also permits an award of attorney fees under the California UTSA. Thus, the trial court's refusal to allow the jury to determine the issue was prejudicial because it foreclosed any possibility Applied might be able to seek an award of fees under Civil Code section 3426.3, subdivision (c).

We reverse the trial court's grant of nonsuit and remand for a jury trial on whether Jarrells's misappropriation was willful and malicious.

## DISPOSITION

The judgment is affirmed in part, reversed in part, and remanded as follows:

We affirm the trial court's finding that Applied prevailed on its claim against Jarrells for trade secret misappropriation, as well as the court's issuance of a permanent injunction against Jarrells following the jury's finding of misappropriation. We also affirm the court's conclusion that the Agreement authorized an award of the reasonable attorney fees, costs, and expenses Applied incurred to obtain injunctive relief.

We reverse as to the amount of attorney fees and costs awarded by the trial court and remand for further proceedings on that issue. More specifically, we reverse the court's blanket reduction of attorney fees and costs by 75 percent to reflect Applied's failure to prevail on three of its four causes of action, as well as the court's blanket denial of all attorney fees and costs Applied incurred for discovery and motion practice. We remand for further proceedings to permit the court to exercise its discretion on each of these issues consistent with the views expressed in this opinion and to determine the appropriate amount of attorney fees and costs awardable under the Agreement. In determining an appropriate amount of attorney fees and costs on remand, the court shall exercise its discretion in applying all of the factors relevant to determining whether the requested amounts were reasonably necessary and were reasonable in amount.

We reverse the trial court's ruling precluding Applied's damages expert from including any portion of the expert witness fees incurred by Applied's forensic computer expert BRG in the damages calculations he presented to the jury. On remand, Applied may seek recovery of the BRG expert fees that can be proven to have been incurred exclusively as to Phase 2 of its investigation into where the files and documents Jarrells took from Applied ended up and how to recover, delete, or otherwise prevent further misappropriation of those files and documents. We affirm the court's ruling

45

denying Applied's postjudgment request for expert witness fees it incurred to obtain injunctive relief.

Finally, we reverse the trial court's grant of nonsuit on whether Jarrells's conduct was willful and malicious and remand for a jury trial on that issue.

In the interests of justice, because each party prevailed in part in this appeal, neither party shall recover costs on appeal.

GOODING, J.

WE CONCUR:

O'LEARY, P. J.

GOETHALS, J.